## PEOPLE v DAVIS

Docket No. 92172. Argued October 13, 1992 (Calendar No. 3). Decided
　　March 2, 1993. Certiorari denied by the Supreme Court of the
　　United States on May 24, 1993, 508 US — (1993).

Harriet Davis was charged in the Detroit Recorder's Court with
　　possession with intent to deliver 50 to 225 grams of cocaine,
　　possession with intent to deliver less than 50 grams of heroin,
　　possession of marijuana, and possession of a firearm during the
　　commission of a felony. The court, Terrance K. Boyle, J.,
　　suppressed the evidence, which had been seized from the defen-
　　dant's motel room, and dismissed the case. The court held that
　　although a radio dispatch gave the police the right to investi-
　　gate a report of gunshots at the defendant's motel, the level of
　　information and the way in which it was given did not justify a
　　nonconsensual entry into the defendant's room. The Court of
　　Appeals, JANSEN, P.J., and WAHLS and HOOD, JJ., reversed in
　　an opinion per curiam, finding the search and seizure legal
　　because it fell under the community caretaker and plain view
　　exceptions to the warrant requirement (Docket No. 125120).
　　The defendant appeals.

In a unanimous opinion by Justice BRICKLEY, the Supreme
　　Court *held:*

Police may enter a dwelling without a warrant when they
　　reasonably believe that a person within is in need of immediate
　　aid. The police must possess specific and articulable facts that
　　lead them to this conclusion, the entry must be limited to the
　　justification therefor, and an officer may not do more than is
　　reasonably necessary to determine whether a person is in need
　　of assistance and to provide that assistance.

1. Police officers may enter premises without warrants where
　　they believe some person is in need of assistance or to prevent
　　serious harm to someone. Although such entries need not be
　　subject to traditional probable cause analysis, their legality
　　should be evaluated on the basis of whether the police reason-
　　ably believed a person needed aid. In this case, the police did

REFERENCES
Am Jur 2d, Searches and Seizures §§ 76, 82, 154, 186.
See ALR Index under House and Home; Search and Seizure.

not have probable cause to search for evidence of a crime, or probable cause that a person was in need of aid.

2. When officers, while performing functions separate from their duties to investigate and solve crimes, characterized as community caretaking functions, enter into a protected area and discover evidence of a crime, the evidence may be admissible. The exception should not be confused with the exigent circumstances exception. Depending on the function at issue, the level of intrusion while performing a caretaking function should be noted in determining admissibility. However, when the police are investigating a situation in which they reasonably believe someone is in need of immediate aid, their actions should be governed by the emergency aid doctrine, regardless of whether these actions also may be classified as community caretaking activities.

3. In this case, the police had no warrant and no probable cause; therefore, they could not legally enter the motel room to search for evidence of a crime. Under the circumstances, they could not have reasonably believed, on the basis of specific and articulable facts, that a person within the defendant's room was in need of immediate aid.

Reversed.

189 Mich App 468; 473 NW2d 748 (1991) reversed.

SEARCHES AND SEIZURES — WITHOUT A WARRANT — EMERGENCY AID EXCEPTION.

Police may enter a dwelling without a warrant when they reasonably believe that a person within is in need of immediate aid; the police must possess specific and articulable facts that lead them to this conclusion, the entry must be limited to the justification therefor, and an officer may not do more than is reasonably necessary to determine whether a person is in need of assistance and to provide that assistance.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, and *Timothy A. Baughman,* Chief, Research, Training and Appeals, for the people.

*Bellanca, Beattie & De Lisle, P.C.* (by *Frank D. Eaman*), for the defendant.

BRICKLEY, J. We have been asked to determine

whether the Court of Appeals erroneously reversed a trial court suppression of evidence seized in a search without a warrant of a motel room following a telephone report of gunfire at that location. We respond in the affirmative and accordingly reverse the Court of Appeals and reinstate the trial court's decision.

I

FACTUAL BACKGROUND

The following facts were elicited during an evidentiary hearing in Detroit Recorder's Court on November 2, 1989. On August 4, 1989, Detroit Police Officers Lynn Brown and Royce Hill were on uniformed patrol in Scout Car 7-5. At 5:35 P.M., the two officers heard a radio dispatch directing Scout Car 7-7 to go to the Belmar Motel, at 3250 East Jefferson in downtown Detroit. The exact words of the broadcast were "7-7, 3250 East Jefferson, Belmar Motel, Room 33 or 34, ah, desk clerk says shots fired." Although this dispatch did not direct them to go to the scene, Officers Brown and Hill did so because they were nearby.

When the officers arrived at the Belmar, they parked their car in front of the motel, adjacent to the office. They observed no unusual activity in or around the motel. They did not speak to the desk clerk or the manager, but instead went directly to the rooms. The officers approached room 33 first, testifying that they did so because it was the first one they came to. As they approached the door to room 33, Officer Brown had drawn his service revolver, and Officer Hill was carrying a shotgun in one hand and a flashlight in the other. The officers knocked on the door, announcing either "police," or "police, open up."

In response to this knocking, defendant Davis

peeked out from between the curtains and looked at the officers, who were standing there with guns drawn. She left the window and the curtains fell back into place. The officers continued to knock and announce their presence, but defendant did not respond. As time passed, the police became more suspicious that defendant was trying to hide something, and continued their attempts to get a response.

The two officers gave different versions of what happened immediately before they entered room 33. Officer Brown testified that while they were trying to get someone to answer the door, a man, whom Officer Brown described as the manager, approached and asked if the officers wanted a key to the room. Officer Brown replied in the affirmative. However, defendant opened the door before the manager returned with the keys. Officer Hill, on the other hand, testified that the officers did not speak to the manager before entering the room. There was no evidence that either of the officers asked this person if he had called 911 and reported that he heard gunshots.

According to the officers, it was three to five minutes before the defendant opened the door. When she finally did, the officers stepped just inside the doorway. After the officers entered the room, they explained to her that they were investigating a report that gunshots had been fired. As they stood there, Officer Brown saw what he thought was a handgun wedged between the mattresses on the bed. He walked over to the bed to retrieve the object and found that it was indeed a gun. In addition, Officer Brown testified that, from his vantage point inside the door, he had observed some objects on the "dresser table." Specifically, he saw a plastic bag with a green substance in it, and a number of pharmaceutical capsules, some

filled with a white substance, and others empty.
Once Officer Brown stepped into the room and
retrieved the gun, Officer Hill walked through the
room and went into the bathroom, to check the
bathroom area to see if any injured persons, sus-
pects, or more weapons were on the premises.
While in the bathroom, Officer Hill discovered
measuring spoons in the toilet bowl and narcotics
in plastic bags on the bathroom sink.

The officers were joined at the scene by other
officers, including a narcotics team, approximately
twenty minutes to one-half hour after searching
the room. According to Officers Hill and Brown,
the unit originally dispatched to the scene, Scout
Car 7-7, never arrived. In total, the police seized
six bottles of narcotics, a blue and white plastic
bag containing two blue envelopes marked "Most
Wanted," one ziplock bag containing rock cocaine,
one aluminum foil container of white powdery
substance, a white pill bottle containing forty-nine
pink capsules that contained a white powdery
substance, a red memo book, one box of packaging
envelopes, an ink pad with a stamp marked "Most
Wanted," three razor blades, two loose pink cap-
sules, three ziplock-type plastic bags and $3,370 in
cash. The officers testified that all of these items
were found on the top of the dresser table.

At the evidentiary hearing, the trial judge asked
Officer Hill what he would have done if, after the
officers entered the room, defendant had told them
to leave without making any investigation. Officer
Hill responded that he would not have allowed her
to close the door and go about her business, "[b]e-
cause due to the run, I didn't know if anyone was
in there shot, could have been somebody in there
hurt." The trial judge asked, "She wasn't gonna go
anywhere until at least you satisfied yourself that
either the shots had not been fired from the room

or that nobody was inside that room wounded?" Officer Hill responded, "Correct."

The police dispatch that originally brought the officers to the Belmar was based on a call to 911. A transcript and tape of that call was admitted into evidence at the hearing. The caller claimed to be the manager of the *"Belmont"* Hotel on Jefferson, and reported hearing "shots coming out of 33 or 34 . . . ." In addition to giving the wrong name of the motel, the caller was unable to give the address or the cross street. In explanation, the caller claimed to have just started working at the Belmar.

The police found no indication that shots were actually fired in either room 33 or 34. No other person, injured or otherwise, was found in room 33. Furthermore, it does not appear that the police ever searched room 34. Officer Brown testified that he never entered room 34, and that he did not know if Officer Hill or any of the police officers who came to the scene ever did. Officer Hill did not testify with regard to this point. It appears that the police quickly came to the conclusion that the report of "shots fired" was false, or that they lost interest in its significance after discovering evidence of a drug violation. In fact, after discovering the evidence, Officer Brown testified that he told defendant that she probably had been "set up," suggesting that he thought the basis of the radio dispatch was false.[1]

---

[1] The tape and transcript also included the actual police dispatch and Scout Car 7-5's response. Although the dispatcher correctly identified the site as the Belmar Motel, rather than the Belmont, either Officer Hill or Officer Brown responded that they were on their way to the *"Belmont"* Hotel, misstating the name exactly as the original caller did. At oral argument, Davis' counsel argued that this raised a possibility that Officers Hill and Brown themselves were somehow involved with the call. However, the 911 call and police response are the only circumstances even suggesting police involvement in "setting up" Davis. The defense introduced no other evidence

Defendant was arrested and charged with four counts: (1) possession with intent to deliver 50 to 225 grams of cocaine, (2) possession with intent to deliver less than 50 grams of heroin, (3) possession of marijuana in violation of MCL 333.7401(2)(a); MSA 14.15(7401)(2)(a), and (4) possession of a firearm during the commission of a felony, MCL 333.7403(2)(d); MSA 14.15(7403)(2)(d). She was bound over to Recorder's Court, where she filed a motion to suppress the evidence seized from her motel room. She contended that the officer's entry and seizure of the evidence violated the United States Constitution, because the officers acted without a warrant and the search and seizure did not fall under any of the exceptions to the warrant requirement.

After the evidentiary hearing, the trial court ordered that the evidence be suppressed and dismissed the case, stating:

> [I]n terms of my holding, whether or not the seizure is justified depends on whether the police had a right to be where they were. I believe that under controlling precedent they did not. The radio run clearly gave the police a right to investigate. *But, the level of information given to the police, and the way in which it was given, cannot justify a nonconsensual entry into private property.* [Emphasis added.]

Although he granted defendant's motion, he did so reluctantly, holding that the police acted reasonably in all that they did, and stated:

> [W]ere I free to create law, I would uphold the seizure . . . but I don't think that there is a general exception for reasonable police activity. I

and the trial judge made no finding that any such thing may have occurred.

think they needed a warrant, or they needed to have their activity fit within one of the recognized exceptions. It doesn't, under the facts of this case. And, as a result, I'm suppressing the evidence.

The people appealed this decision.

The Court of Appeals held that the trial court erred in suppressing the evidence and reversed. 189 Mich App 468; 473 NW2d 748 (1991). The Court of Appeals stated that in order for a search without a warrant to be reasonable under the Fourth Amendment, probable cause and a circumstance establishing an exception to the warrant requirement must exist. *Id.,* pp 472-473. The Court found that the search and seizure was legal because it fell under the community caretaker and plain view exceptions to the warrant requirement. *Id.,* p 476. It described the community caretaker exception as a "well-recognized subcategory" of the exigent circumstances exception. *Id.,* p 474. It stated, the "police have a right to enter premises, provided there is probable cause,[2] as part of their routine community caretaking function." *Id.,* pp 474-475. Responding to reports of gunfire in residential areas is one of these caretaking functions, and such a report provides the necessary probable cause. *Id.,* p 475.

Furthermore, the Court also stated that the police may make entries without warrants into protected areas when they reasonably believe a person within is in need of immediate aid. *Id.,* p 475. However, the Court did not provide further analysis of this doctrine, and did not specifically apply it to the facts of this case. Finally, it found that the seizure of the incriminating evidence was

---

2 The people acknowledge that there is no probable cause here, but argue that the community caretaker doctrine requires something less than probable cause.

legal under the plain view exception to the warrant requirement. *Id.,* pp 476-477.[3]

The Court of Appeals denied defendant's motion for rehearing on July 25, 1991. This Court granted leave to appeal, 439 Mich 1008 (1992).

II

These facts require us to determine whether the United States Constitution permits the police to force entry into a motel room on the basis of a police dispatch stating that a witness reported hearing gunshots coming from one of two motel rooms, without further corroboration. This in turn requires a discussion of two exceptions to the warrant requirement: first, what is often called the emergency aid exception and, second, what is sometimes called the community caretaking exception.[4]

The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures and provides that no warrants shall issue without probable cause.[5] The Michigan constitu-

---

[3] The Court of Appeals erroneously stated that the police were outside the motel room when they observed the gun. The people have conceded that the police entered the room before they saw the gun or narcotics and paraphernalia.

[4] Even though we resolve this case on the basis of the emergency aid doctrine, the Court of Appeals assertion that the community caretaker function is a subcategory of the exigent circumstances doctrine requires a more general clarification of the exceptions to the warrant requirement.

[5] The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In view of our conclusion that the Fourth Amendment was violated, it

tional provision is substantially the same. Const 1963, art 1, § 11. Essentially, in order to search a dwelling for evidence of a crime, the police must have probable cause to search, and must also have a warrant based on that probable cause. *People v Blasius,* 435 Mich 573; 459 NW2d 906 (1990), citing *Coolidge v New Hampshire,* 403 US 443, 455; 91 S Ct 2022; 29 L Ed 2d 564 (1971); see also *Payton v New York,* 445 US 573, 590; 100 S Ct 1371; 63 L Ed 2d 639 (1980). The United States Supreme Court has recently reiterated this requirement, noting: Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment, " 'subject only to a few specifically established and well-delineated exceptions.' " *Horton v California,* 496 US 128, 133, n 4; 110 S Ct 2301; 110 L Ed 2d 112 (1990). See also *Mincey v Arizona,* 437 US 385; 98 S Ct 2408; 57 L Ed 2d 290 (1978). Thus, in order to show that a search was legal, the police must show either that they had a warrant, or that their conduct fell under one of the narrow, specific exceptions to the warrant requirement.

Examples of exceptions to the warrant requirement are: (1) searches incident to arrest, (2) automobile searches and seizures, (3) plain view seizure, (4) consent, (5) stop and frisk, and (6) exigent circumstances. *People v Toohey,* 438 Mich 265, 271, n 4; 475 NW2d 16 (1991). See also *People v Blasius, supra.*

Finally, an occupant of an hotel or motel room is also entitled to the Fourth Amendment protection against unreasonable searches and seizures. *Stoner v California,* 376 US 483, 489-490; 84 S Ct 889; 11 L Ed 2d 856 (1964).

A number of potential issues are not disputed by the parties. First, the people concede that the

is unnecessary for us to discuss the parallel provision of the Michigan Constitution.

police officers entered defendant's room. They also concede that defendant did not consent to this entry. Further, they do not claim that defendant lacks standing to invoke Fourth Amendment protections because she was in a motel room. The people also concede that Officers Brown and Hill had no warrant to search defendant's room, nor did they have probable cause to believe that evidence of a crime could be found within the room. Defendant, on the other hand, does not dispute that the evidence in question was in plain view once the police were in the room. Nor does she attack the scope of the search that the police made after entering the room. The only point of contention between the parties is whether the police had the right to enter the room.

The people contend that the officers were performing an "emergency circumstance" or "community caretaking" search and thus the searches should be found legal if the police were acting reasonably. Traditional probable cause should not be required. Defendant asserts that these exceptions do not justify the police entry.

The so-called emergency aid exception was described by the United States Supreme Court in *Mincey v Arizona, supra,* and what is sometimes called the community caretaker exception was recognized by that Court in *Cady v Dombrowski,* 413 US 433; 93 S Ct 2523; 37 L Ed 2d 706 (1973). These exceptions have been recognized by this Court in *City of Troy v Ohlinger,* 438 Mich 477; 475 NW2d 54 (1991). These doctrines are unique in the area of search and seizure, because when the actions of agents of the state fall under one of these exceptions, contrary to the assertion of the Court of Appeals, such agents generally need not have the probable cause traditionally required in searches for evidence in order to enter into a

protected area. It is well settled that in order to search for evidence of a crime, police must have probable cause that a crime has been committed and evidence of the crime is to be found in the place to be searched. However, when police are performing "caretaking" functions, they are usually not searching for anything. Similarly, in cases involving the emergency aid doctrine, the police are not searching for evidence of a crime, but are searching for a person in need of immediate aid. When these doctrines are implicated, the question becomes: what degree of information or suspicion must the police have in order to search for such a person?

### A. THE EMERGENCY AID EXCEPTION

Federal and state courts have long recognized an exception to the Fourth Amendment that allows police officers to make entries without warrants under circumstances where they believe some person is in need of assistance or to prevent serious harm to someone. An early enunciation of this doctrine appeared in the influential case *Wayne v United States,* 115 US App DC 234; 318 F2d 205 (1963), cert den 375 US 860 (1963), in which the United States Court of Appeals for the District of Columbia stated:

> [A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. . . . A myriad of circumstances could fall within the terms "exigent circumstances" referred to in e.g., smoke coming out a window or under a door, the sound of

gunfire in a house, threats from the inside to shoot
through the door at police, reasonable grounds to
believe an injured or seriously ill person is being
held within. [115 US App DC 241. Citation omit-
ted.]

The United States Supreme Court recognized
this exception in *Mincey v Arizona, supra.* In
refusing to recognize a general murder scene ex-
ception, the *Mincey* Court set forth the following
dicta:

Numerous state and federal cases have recog-
nized that the Fourth Amendment does not bar
police officers from making warrantless entries
and searches when they *reasonably believe* that a
person within is in need of immediate aid. [437 US
392. Citations omitted; emphasis added.]

This language indicates that such "entries" need
not be subject to traditional probable cause analy-
sis, but that their legality should be evaluated on
the basis of whether the police "reasonably be-
lieved" a person needed aid.

The only case decided by this Court that deals
with the emergency aid exception is *Ohlinger,
supra.*[6] It does not, however, completely resolve the
issues we face. In *Ohlinger,* the police received a
report of a car accident from an eyewitness. The
witness told the police he had heard a crash
outside his home and saw a car being driven away
by a man holding his head as if he had been
injured. The witness gave the license plate number
to the police officer, who went to the owner's
address. When he arrived, the officer saw a car
matching the witness' description parked in the

─────────────────

[6] It is important to note that *Ohlinger* was decided after the Court
of Appeals made its decision in this case, so it did not have the benefit
of our analysis in this area.

driveway, with its front end smashed in. He knocked at the door, but received no answer. He shined his flashlight into a few windows, and eventually saw Ohlinger lying on a bed with his head bleeding. He entered the house and tried to rouse Ohlinger. The officer testified that he smelled alcohol on Ohlinger's breath and that Ohlinger's speech was slurred. Ohlinger was arrested and charged with operating a motor vehicle under the influence, and leaving the scene of a personal injury accident. *Id.,* pp 479-481.

This Court ruled that the entry into Ohlinger's home was legal and that the evidence obtained as a result was admissible. In part, the entry was justified on the grounds that the police had probable cause to arrest. However, this Court also held:

> Where the police have *probable cause, based on specific, articulable facts, to believe that immediate entry is necessary to assist a person who may be in serious need of medical aid, they may enter without a warrant.* The entry must be limited to the justification therefor, and the officer must be motivated primarily by the "perceived need to render aid or assistance." [*Id.,* pp 484-485. Citation omitted; emphasis added.]

It is possible to read *Ohlinger* as requiring the police to have probable cause to believe a person was in need of immediate aid before they can enter a dwelling without a warrant. However, the people submit that *Ohlinger* only requires that the police have "reasonable belief" because, in formulating the standard in *Ohlinger,* this Court relied on *Mincey* and other cases in which reasonable belief is the standard. The people point out that, in *Ohlinger,* this Court stated the dicta from *Mincey* that police may make entries to render emergency aid on the basis of reasonable belief. *Ohlinger,*

p 481. Thus, the people submit, all the police must show to invoke this exception is that they reasonably believe that a person inside a dwelling is in need of immediate aid. It is difficult to respond to the people's argument with regard to *Ohlinger* because of the facts of that case. In *Ohlinger,* the police not only had probable cause that a person was in need of immediate aid, but also had probable cause to arrest that person. Thus, we did not focus on whether the police needed to have probable cause or reasonable belief. However, in this case, there is no question that police did not have probable cause to search for evidence of a crime, or probable cause that a person was in need of aid. Thus, we must clarify what standard of belief the police must have to invoke this exception.

First, we look to *Mincey, supra.* Although it is not clear how to apply the standard articulated in *Mincey,* that case cites a number of state and federal cases that did apply this doctrine. The Court specifically stated that in citing those cases, it did not necessarily approve their holdings. However, some of these cases remain influential and thus shed some light on how to actually apply this exception to the warrant requirement.

For example, *People v Barone,* 330 F2d 543 (CA 2, 1964), cert den 377 US 1004 (1964), is particularly instructive because, as in this case, the police initially entered the premises to investigate what they suspected was an emergency situation. However, it turned out that no emergency existed, and the police seized evidence that resulted in the conviction of a crime unrelated to the original reason the police entered defendant's dwelling. In *Barone,* the police heard screams coming from a room in a rooming house. They knocked on the door, which was answered by two women who claimed not to have heard any screams. One of the

women suggested that she might have been having a nightmare. The officers then heard the sound of a toilet flushing, and the defendant then emerged from the bathroom. One of the officers ran into the bathroom and saw pieces of paper money floating in the toilet, which he retrieved. They later turned out to be counterfeit bills. *Id.,* p 544. Pursuant to finding this search legal, the United States Court of Appeals for the Second Circuit stated:

> The right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as peace officers and derives from the common law. Indeed, it is obvious that had the patrolmen been denied entry to the apartment they would have had the right, if not the duty, to gain entry forcibly. [*Id.,* p 545. Citations omitted.]

*Root v Gauper,* 438 F2d 361 (CA 8, 1971), is another frequently cited federal case relied upon by *Mincey. Root* is helpful because it addresses the question of the level of suspicion the police must have to justify entry. In this case, the victim of a shooting contacted the operator for an ambulance. The police were dispatched to the area. The victim was removed from the home before the police arrived. The police entered the house upon arrival, even though they knew the victim had already been removed. *Id.,* p 363.

In holding that this search was not justified by the emergency doctrine, the Eighth Circuit Court of Appeals stated that there was no evidence that the police believed that an emergency existed at the time of entry. *Id.,* p 365. The court did not apply a traditional probable cause analysis, but instead stated that the police could legally enter a

dwelling if they had a reasonable suspicion that an emergency existed. According to the *Root* court, the legality of such a search depends on whether the officer can point to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant such an intrusion. *Id.,* p 365.

We find that a number of our sister courts have also formulated persuasive and instructive tests. For example, Wisconsin articulated such a test in *State v Prober,* 98 Wis 2d 345; 297 NW2d 1 (1980),[7] a case we cited in *Ohlinger, supra,* p 484, n 6. *Prober* was decided in 1980, and at that time the Wisconsin Supreme Court had already recognized and applied some form of the emergency aid exception in several cases.[8]

The court needed to determine whether a belief that the defendant was overdosing on some drug justified a police search of the defendant's handbag that may have contained such a drug. In order to evaluate the legality of this search, the court formulated a test for what it referred to as the medical "emergency doctrine exception to the warrant requirement." *Id.,* p 362. Accordingly, the court formulated a two-part test for a valid without a warrant search comprised of both a subjective and an objective element. First, the officer performing the search must actually be motivated by a perceived need to render aid. Second, even if the officer is actually motivated by this perceived need, the circumstances must be such that a reasonable person would think that an emergency existed. *Id.,* p 365. Accordingly, the court found

---

[7] *Prober* was overruled on other grounds in *State v Weide,* 155 Wis 2d 537; 455 NW2d 899 (1990).

[8] See *State v Pires,* 55 Wis 2d 597; 201 NW2d 153 (1972); *State v Hoyt,* 21 Wis 2d 284; 124 NW2d 47 (1964); *State v Davidson,* 44 Wis 2d 177; 170 NW2d 755 (1969); *La Fournier v State,* 91 Wis 2d 61; 280 NW2d 746 (1979).

that this test was not met and suppressed the evidence found in the defendant's purse. *Id.,* p 366.

The Wisconsin Supreme Court has applied this test in determining the lawfulness of an entry into a home. For example, in *State v Boggess,* 115 Wis 2d 443; 340 NW2d 516 (1983), it held that an entry into a defendant's home to investigate an anonymous call reporting that children living there had been abused and were in need of medical attention was legal under the emergency exception. *Id.,* pp 445-446. The caller supplied details including the names of the children and the fact that one of the children was limping and bruised, and stated that he knew the children and the defendant fairly well. A social worker and a police officer went to the defendant's home, entered without a warrant and without the defendant's consent, and found injured children and other evidence used to charge the defendant with child abuse. *Id.,* pp 445-448.

The court applied the test articulated in *Prober,* finding that the entry into the defendant's home was legal under the emergency exception to the warrant requirement. *Id.,* p 458. It noted that the trial court had made a finding that the social worker and police officer were motivated by a perceived need to render aid or assistance, and thus the subjective part of the *Prober* test was met. *Id.,* p 450. As for the second step, it found that a reasonable person would believe that an emergency requiring immediate entry existed. *Id.,* p 458. Although the court acknowledged that an anonymous call is a less reliable source of information than some other sources might be, it found that because the call in this case provided such detailed information, some of which was corroborated before the social worker and police officer entered the home, it could support a reasonable

belief that an emergency requiring immediate entry existed. *Id.,* pp 453-454.

The New York Court of Appeals fashioned a useful test in *People v Mitchell,* 39 NY2d 173; 383 NYS2d 246; 347 NE2d 607 (1976), cert den 426 US 953 (1976). Although this case predates *Mincey,* we find it consistent with *Mincey,* and instructive. While conducting a search of a hotel for a missing chambermaid, the police entered the defendant's room, observed blood stains on the carpeting, opened a closet door, and discovered the maid's body. The New York Court of Appeals upheld the entry into the room under what they called the emergency doctrine. They formulated a three-part test for applying this doctrine:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.
> (2) The search must not be primarily motivated by intent to arrest and seize evidence.
> (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place searched. [*Id.,* pp 177-178.]

In formulating this test the court acknowledged that police officers need not be completely unmotivated by the desire to solve a crime to invoke this exception. It noted that in many emergency situations there is a very strong possibility that criminal activities could account for the emergency. Thus, the police are bound to be motivated in part by the desire to solve a crime in most emergency situations. However, because this exception is a narrow one, courts must closely scrutinize the actions and motives of the police in order to determine whether the exception applies. This

test is a means of subjecting police actions to that scrutiny.

Finally, we note that one commentator sets forth the standard required for police to act as whether the police had reasonable grounds to believe that some kind of emergency existed. 2 LaFave, Search & Seizure, § 6.6(a), p 698. Specifically, there must be evidence that would lead a prudent and reasonable official to see a need to act. *Id.* The officer must be able to point to specific and articulable facts, which, taken with rational inferences from those facts, reasonably warrant intrusion into protected areas. *Id.*

This survey of the cases that we relied upon in *Ohlinger* and of other leading cases in this area makes it clear that much authority supports the conclusion that while the police need not possess probable cause that a person is in need of immediate aid before entering a dwelling, they must possess a reasonable belief that such circumstances exist.

### B. THE COMMUNITY CARETAKING FUNCTION

The police perform a variety of functions that are separate from their duties to investigate and solve crimes. These duties are sometimes categorized under the heading of "community caretaking" or "police caretaking" functions. When police, while performing one of these functions, enter into a protected area and discover evidence of a crime, this evidence is often admissible. The people argue here that administering emergency aid is one of the caretaking functions of the police, and, because the police officers in this case were performing a caretaking function and doing so in a reasonable way, the discovered evidence should be admitted.

The first United States Supreme Court case that

discussed the community caretaking exception to the warrant requirement was *Cady v Dombrowski, supra.* In *Cady,* the defendant was seeking to suppress evidence discovered through a search of his automobile without a warrant, which had been towed at police request to a nearby private garage. The defendant was an off-duty Chicago police officer who had crashed his car into a bridge abutment in rural Wisconsin. Officers came to the scene, discovered that the defendant was drunk, arrested him for drunk driving, and sent him to the hospital. They then towed his car to a private garage. One of the officers noticed that the defendant did not have his gun with him when he was arrested. Because he thought that Chicago police officers were required to carry their guns with them at all times, he believed that the gun must be in the car. He went to the garage and searched the defendant's car, discovering bloody clothes, and a blood-spotted flashlight. These other items found in the car were used to convict the defendant of murder. *Id.,* pp 435-439.

The United States Supreme Court held that this entry into the car was legal and that the evidence should not be suppressed. In finding the intrusion legal, the Court noted that the officers were not searching for evidence of any crime, but rather were confronting one of the situations that local police officers frequently encounter and were acting in an administrative, rather than investigatory, capacity. The Court stated that the police were acting pursuant to their "community caretaking function," which the Court described as follows:

> Local police officers . . . frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of

a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute. [*Id.,* p 441.]

So, according to the United States Supreme Court, the defining characteristic of community care- ·taking functions .is that they are totally unrelated to the criminal investigation duties of the police.

*Cady* does not include any discussion of the standard of suspicion required for police to enter into protected areas when performing these functions. It is clear from the Court's opinion that the concepts of probable cause and reasonable suspicion were inapposite to an inquiry into whether the police action in this case violated the Fourth Amendment. The Court's opinion suggested that because the police were not looking for any evidence of a crime, they needed no suspicion at all to "search."

Federal and state courts have included a variety · of police activities under the heading of community caretaking functions. Courts have held that impoundment of automobiles and inventory searches of them, as in *Cady,* responding to missing vehicle complaints,[9] investigating noise complaints,[10] and searching an unconscious person for

---

[9] In *Duck v State,* 518 So 2d 857 (Ala Crim App, 1987), the defendant filed a missing vehicle complaint, then later withdrew it. Two police officers came to his trailer home to have him sign a form withdrawing his original complaint. When they entered his home, they saw marijuana in plain view. The Alabama Court of Criminal Appeals held that this "search" was legal, stating that the officers had a right to be where they were when they saw the marijuana because they were carrying out a routine community caretaking function. *Id.,* p 860.

[10] *State v Bies,* 76 Wis 2d 457, 470-471; 251 NW2d 461 (1977). In this case, the Wisconsin Supreme Court held that when a police officer, in response to a noise complaint, entered the defendant's yard, looked into his open garage, and discovered evidence of a crime, the

identification[11] are community caretaking functions.

The people assert that rendering aid to persons in distress is one of the community caretaking functions of the police. We agree. Indeed, this Court already stated that entries made to render aid to a person in a private dwelling were part of the community caretaking function, *Ohlinger, supra,* p 483.

In *United States v Nord,* 586 F2d 1288, 1290-1291 (CA 8, 1978), the Court of Appeals held that the community caretaking functions of the police include responding to persons in need of immediate aid. In this case, a friend of the defendant contacted the police and let them into the defendant's home to check on the defendant's welfare. The police found guns in plain view. The police discovered that the defendant was a convicted felon, and he was ultimately convicted of possessing weapons. *Id.,* p 1289. Nord challenged his conviction on the ground that the police were improperly in his home when they saw the guns. The federal district court had ruled that the police had a right to be in the home while carrying out their routine community caretaking functions, which included responding to calls requesting assistance for persons in need of immediate aid. *Id.,* pp 1290-1291. The Eighth Circuit affirmed the district court holding.

This Court has issued only two decisions besides *Ohlinger* discussing the community caretaker exception. Both relate to police impoundment and inventory of automobiles. In *People v Toohey,*

---

search was legal. The court held that investigating such a complaint was "probably" a part of the community caretaking function. *Id.,* p 471. When acting pursuant to this function, the court stated, the conduct of the police should be evaluated pursuant to a reasonableness standard. *Id.,* p 468.

[11] *State v Hutchison,* 56 Wash App 863; 785 P2d 1154 (1990).

*supra,* p 291, this Court held that an impoundment and inventory search were constitutional because they were conducted in accordance with departmental procedures. We noted that impoundment and inventory were constitutionally valid as part of the caretaking function performed by the police. *Id.,* p 275. In *People v Krezen,* 427 Mich 681; 397 NW2d 803 (1986), this Court upheld an impoundment of a vehicle pursuant to an arrest. This Court stated that the impoundment was done pursuant to the officers' "caretaking function rather than an *investigative* one, instituted according to standard departmental policy to protect the defendant and the police . . . ." *Id.,* p 688 (opinion by BOYLE, J.). (Emphasis added.) This list of community caretaking functions, obviously, is not exhaustive. Indeed, many functions could be considered "caretaking" functions, as long as they are not performed to investigate or solve crimes.

We conclude that the Court of Appeals was in error when it found the community caretaking exception to be a subcategory of the exigent circumstances exception to the warrant requirement. In so stating, they confused two very distinct doctrines. Neither the community caretaking nor the emergency aid exceptions should be confused with the exigent circumstances exception. When the police act pursuant to the exigent circumstances exception, they are searching for evidence or perpetrators of a crime. Accordingly, in addition to showing the existence of an emergency leaving no time for a warrant, they must also possess probable cause that the premises to be searched contains such evidence or suspects. See *People v Blasius, supra,* pp 593-594. See also *Schmerber v California,* 384 US 757; 86 S Ct 1826; 16 L Ed 2d 908 (1966); *Vale v Louisiana,* 399 US 30; 90 S Ct 1969; 26 L Ed 2d 409 (1970). In contrast, the community caretaker exception is only invoked

when the police are not engaged in crime-solving activities.

Further, although administering emergency aid is referred to as one of the community caretaking functions of the police, this should not have any effect on the law governing the emergency aid exception. While categorizing these different activities under the heading of "community caretaking functions" may be useful in some respects, it does not follow that all searches resulting from such activities should be judged by the same standard. Community caretaking activities are varied and are performed for different reasons. Although, for example, inventory of a car and entry into a dwelling may both be categorized as "caretaking functions," it does not follow that both types of activities should be judged by the same standard. It is particularly important to note that the levels of intrusion the police make while performing these functions are different. For example, a police inventory of a car is much less intrusive than a police entry into a dwelling. The extent to which the police intrude into protected areas is only one of the unique issues presented by the emergency aid doctrine. This is why so many courts have seen fit to articulate standards specifically applicable to emergency aid entries. Accordingly, we hold that when the police are investigating a situation in which they reasonably believe someone is in need of immediate aid, their actions should be governed by the emergency aid doctrine, regardless of whether these actions can also be classified as community caretaking activities.

Drawing upon the standard articulated in *Ohlinger,* and upon the cases discussed above, we hold that police may enter a dwelling without a warrant when they reasonably believe that a person within is in need of immediate aid. They must possess specific and articulable facts that lead

them to this conclusion.[12] In addition, the entry must be limited to the justification therefor, and the officer may not do more than is reasonably necessary to determine whether a person is in need of assistance, and to provide that assistance.[13]

### III

In this case, the police had no warrant and no probable cause. Therefore, they could not legally enter the motel room to search for evidence of a crime. The entry can only be justified by showing that they had another purpose—one that fits one of the exceptions requiring less than probable cause.

The test we have articulated requires a determination of whether the officers possessed a reasonable belief based on specific, articulable facts that someone in room 33 was in need of immediate aid. The police had received a radio dispatch informing them that the manager at the motel had reported hearing shots fired in or out of one of two motel

---

[12] In formulating this test, we draw upon the Wisconsin test discussed above. However, because it is not necessary to do so in order to resolve this case, we will not determine today whether we will adopt the subjective element of the test the Wisconsin court articulated. However, we do note that it is important to place strict limits on the application of this emergency aid exception. A finding that police are entering to administer aid and not to search for evidence is implicit in a finding that their entries fall under this exception. In the words of Professor LaFave:

> Any conduct within [a dwelling] by the officer which is in any way inconsistent with the purported reason for the entry is a just cause for healthy skepticism by the courts. . . . [I]t is essential that courts be alert to the possibility of subterfuge, that is, a false claim of such a purpose where the true intent is to seek evidence of criminal conduct. [2 LaFave, *supra*, p 706.]

[13] The requirement that, after entry, the police not do more than is necessary to determine whether a person is in need of aid is not at issue here because the officers in this case immediately saw evidence in plain view upon entering the room.

rooms. We note again the words of the dispatch: "Belmar Motel, Room 33 or 34, desk clerk says shots fired." The dispatch identified two possible rooms. It also directed them to a possible witness. It does not suggest that any person was injured, other than by implication because of the inherently dangerous nature of gunshots. With this dispatch as their only source of information, upon arriving at the motel, the police proceeded to one of the two rooms, where they encountered an occupant who was unwilling to open the door. This is the totality of information that the police had before them.

It is important to note that unlike *Barone, supra,* where the police themselves heard screams, the police in this case had not heard shots fired. Nor did they interview any witnesses who heard them, not even the desk clerk, whom the dispatch identified as the source of the information. Further, as we noted above, unlike *Boggess, supra,* where the anonymous caller gave considerable detail about alleged child abuse, the initial source of information here gave very little detail about the situation. In this case, the caller claimed to be the manager of the motel, but gave an incorrect name of the motel, and was unable to provide its address or cross street, purportedly because of having just started the job. In addition, the record does not indicate that the police made inquiries of the manager who approached them, or that they knocked on other doors. They encountered no circumstances that suggested that shots *had* in fact been fired. We recognize that the defendant took several minutes to open the door and that the police became suspicious that she was hiding something. Indeed, they could well have considered the possibility that she was concealing a person in need of aid. However, there are other possible

explanations for her behavior. She could have been dressing, concealing contraband, or simply been unwilling to open the door. The mere fact that she delayed in opening the door does not, in our judgment, support a reasonable belief that a person within the room was in need of immediate aid.

The issue in this case is not whether the sound of gunfire could justify entry into a motel room under the emergency aid doctrine. We surmise that in most cases it would. The issue, rather, is whether information reporting such sounds coming from a somewhat questionable source who possesses limited knowledge of the location of the motel was, without further corroboration, sufficient to provide a reasonable basis on which to expect that a person or persons were in need of emergency aid. Under the circumstances of this case, we answer that question in the negative.

As the trial judge stated, we do not question that the police may investigate when they receive a dispatch like this one, but rather in what manner they may do so. Our decision requires that the police have reasonable belief, based on specific and articulable facts, that a person within is in need of immediate aid before they force entry into a dwelling. The police were unquestionably justified in investigating the radio dispatch. They were justified in going to the door of room 33 and attempting to ascertain *if* shots had indeed been fired. They were free to interview a manager or desk clerk, or the occupants of adjoining rooms. However, the constitution prohibits them from forcing entry into a dwelling on the basis of a speculation that someone inside may have been injured.

Accordingly, we find that the people have not shown that the police reasonably could have believed, on the basis of specific and articulable facts,

that a person within room 33 was in need of immediate aid. The police were thus not authorized to force entry into the room. Therefore, we hold that the entry into defendant's room violated the Fourth Amendment, and the evidence obtained pursuant to that entry must be suppressed.

Reversed.

CAVANAGH, C.J., and LEVIN, BOYLE, RILEY, GRIFFIN, and MALLETT, JJ., concurred with BRICKLEY, J.