*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

　　　　　Plaintiff-Appellee,

v

ROBERT WILLIAM WILSON,

　　　　　Defendant-Appellant.

UNPUBLISHED
November 18, 2024
9:48 AM

No. 370063
Macomb Circuit Court
LC No. 2023-000664-FC

Before: CAMERON, P.J., and K. F. KELLY and GARRETT, JJ.

PER CURIAM.

In this interlocutory appeal, we consider whether police violated defendant Robert Wilson's Fourth Amendment rights when they entered a motel room shared by Wilson and his girlfriend, LM, and found LM's deceased body in plain view. The prosecutor charged Wilson with second-degree murder, MCL 750.317, concealing the death of an individual, MCL 333.2841(3), and assaulting, resisting, or obstructing a police officer, MCL 750.81d(1). Wilson appeals by leave granted the trial court's denial of his motions to suppress evidence police found during their warrantless entry, and incriminating statements Wilson made while in police custody. We hold that the trial court did not err when it denied Wilson's motions to suppress and, therefore, we affirm.

## I. BACKGROUND

On June 11, 2022, Officer Daniel Toth and other Warren Police Officers went to a Motel 6 to conduct a welfare check on LM. LM's family last heard from LM on June 6, 2022, and reported her missing to police on June 9, 2022. The family told police that they last saw LM with Wilson and notified police when they found Wilson's car in the motel parking lot. Officers ultimately entered a motel room Wilson shared with LM and found LM's body. The next day, Warren Police Detective Lewis interrogated Wilson after advising him of his *Miranda*[1] rights. At a second interview on June 14, 2022, Detective James Twardesky repeated the *Miranda* warnings

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

-1-

and again interviewed Wilson, at which time Wilson admitted that he caused LM's death by strangulation.

After his preliminary examination, Wilson moved to suppress the evidence police found in the motel room because officers entered the room without a warrant. Wilson also moved to suppress the incriminating statements he made to Detective Twardesky. The trial court denied Wilson's motions and this Court granted Wilson's interlocutory application for leave to appeal. *People v Wilson*, unpublished order of the Court of Appeals, issued May 7, 2024 (Docket No. 370063).

## II. STANDARDS OF REVIEW

We review de novo whether a search violated the Fourth Amendment and whether the evidence must be excluded from a defendant's trial. *People v Hyde*, 285 Mich App 428, 438; 775 NW2d 833 (2009). "This Court reviews a trial court's findings of fact at a suppression hearing for clear error and reviews de novo its ultimate decision on a motion to suppress the evidence." *People v Tavernier*, 295 Mich App 582, 584; 815 NW2d 154 (2012). A trial court's finding is clearly erroneous when, although there is evidence to support it, we are left with a definite and firm conviction that a mistake was made after reviewing the whole record. *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008), amended 481 Mich 1201 (2008). When, as in this case, a trial court's findings involve video evidence also available to this Court, we need not rely exclusively on the court's factual conclusions about the video. See *People v Kavanaugh*, 320 Mich App 293, 298; 907 NW2d 845 (2017).

## III. WARRANTLESS ENTRY INTO MOTEL ROOM

Wilson argues the trial court erred by ruling that the warrantless entry of his motel room was justified under an exception to the warrant requirement. We disagree.

## A. LEGAL PRINCIPLES

"Both the United States and Michigan Constitutions guarantee the right against unreasonable searches and seizures." *People v Armstrong*, 344 Mich App 286, 295; 1 NW3d 299 (2022). See also US Const, Am IV; Const 1963, art 1, § 11. "Searches or seizures conducted without a warrant are per se unreasonable, subject to several well-delineated exceptions." *People v Moorman*, 331 Mich App 481, 485; 952 NW2d 597 (2000). The government bears the burden of showing that an exception to the warrant requirement applied to the search and seizure. *People v Cartwright*, 454 Mich 550, 561; 563 NW2d 208 (1997). Even when an exception to the warrant requirement applies, the search itself must be reasonable. *Id*. at 558. Our courts measure reasonableness by examining the totality of the circumstances, which "is a fact-intensive inquiry that does not lend itself to resolution through the application of bright-line rules." *People v Williams*, 472 Mich 308, 314; 696 NW2d 636 (2005). An occupant of a motel room is entitled to the Fourth Amendment protection against unreasonable searches and seizures. *People Davis*, 442 Mich 1, 10; 497 NW2d 910 (1993).

"[W]arrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless

search is objectively reasonable under the Fourth Amendment." *Brigham City, Utah v Stuart*, 547 US 398, 403; 126 S Ct 1943; 164 L Ed 2d 650 (2006), quoting *Mincey v Arizona*, 437 US 385, 393-394; 98 S Ct 2408; 57 L Ed 2d 290 (1978). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Id*. "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id*. In this context, police officers "do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Michigan v Fisher*, 558 US 45, 49; 130 S Ct 546; 175 L Ed 2d 410 (2009) (quotation marks omitted). Instead, the question is "whether there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger . . . ." *Id*. (quotation marks and citation omitted).

The Michigan Supreme Court has recognized that "rendering aid to persons in distress is one of the community caretaking functions of the police." *Davis*, 442 Mich at 23. "[T]he defining characteristic of community caretaking functions is that they are totally unrelated to the criminal investigation duties of the police." *Id*. at 22, citing *Cady v Dombrowski*, 413 US 433, 441; 93 S Ct 2523; 37 L Ed 2d 706 (1973). The Michigan Supreme Court identified "community caretaking" as a separate exception to the warrant requirement, and explained that "when the police are investigating a situation in which they reasonably believe someone is in need of immediate aid, their actions should be governed by the emergency aid doctrine, regardless of whether these actions can also be classified as community caretaking activities." *Id*. at 25. When acting under the emergency-aid doctrine, an entering officer must possess specific and articulable facts that lead him or her to the conclusion that a person inside a home is in need of aid. *Id*. at 25-26. Under this exception, police may not enter "a dwelling on the basis of a speculation that someone inside may have been injured." *Id*. 28.

In *Caniglia v Strom*, 593 US 194, 196; 141 S Ct 1596; 209 L Ed 2d 604 (2021), the United States Supreme Court held that the community-caretaking exception differs from the exigent circumstances exception for rendering emergency services. Specifically, the Court held that the "caretaking" duty of police officers does not create "a standalone doctrine that justifies warrantless searches and seizures in the home." *Id*. at 196. "This recognition that police officers perform many civic tasks in modern society was just that—a recognition that these tasks exist, and not an open-ended license to perform them anywhere." *Id*. at 199. However, the Court made clear "that law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id*. at 198 (quotation marks and citations omitted). Additionally, under Michigan law, "when the police are investigating a situation in which they reasonably believe someone is in need of immediate aid, their actions should be governed by the emergency aid doctrine, regardless of whether these actions can also be classified as community caretaking activities." *Davis*, 442 Mich at 25.

## B. DISCUSSION

As stated, the question before us is whether the trial court erred when it ruled that the police officers' entry into the motel room occupied by Wilson and LM fell within an exception to the warrant requirement.

Before reaching the substance of this issue, we note that the trial court erred by citing the community-caretaking exception to deny Wilson's motion to suppress. As discussed, community-caretaking is not a standalone exception to the warrant requirement. *Caniglia*, 593 US at 196. But the record reflects that, although the trial court mislabeled the applicable exception, the court actually analyzed the officers' actions by considering whether they reasonably believed that LM may have needed emergency aid as discussed by our Supreme Court in *Davis*, 442 Mich at 22-25. Accordingly, any error in the trial court's labeling of the exception was harmless.

Our review of the record supports the trial court's ruling that the police officers reasonably believed LM was inside the motel room and in need of immediate aid. LM's family reported her missing and informed police that LM had a severe, chronic alcohol addiction. Although LM was an adult, her disappearance, her failure to communicate with her family for several days, and her dangerous alcoholism raised grave concerns about her wellbeing. LM's mother reported to police that she last saw LM when she left home with Wilson. A few days later, LM texted her mother that she was "ok" and asked for "some space," but five days passed with no contact from LM, which was unusual enough for LM's family to not only make a missing person report to police but to physically conduct a search for her. The family immediately called police when they located Wilson's car at the Motel 6, they told officers that they believed LM was in a motel room with Wilson, they remained while the officers attempted to make contact with LM, and they were plainly distraught about LM's well-being throughout the incident.

Bodycam footage showed that the officers went to the motel office to ask whether Wilson and LM were guests at the motel. An officer received an access key card from a staff member, and was directed to room 128. When the police knocked on the door to room 128, they identified themselves as police officers. No one initially answered the door, but the officers heard mumbling from within the room. At one point, a person said, "I'm good," but the officers continued to knock to make contact with LM. After waiting for a response from repeated knocking, an officer inserted the keycard into the door's card reader but, as he did so, Wilson voluntarily opened the motel room door. Wilson appeared intoxicated, and officers could see inside the room, which was in disarray, the bed was pushed out of place, and there were numerous beer cans and bottles of liquor around the room.

The officers said they were looking for LM and asked Wilson, "Where would [LM] be?" Instead of answering, Wilson uttered a sigh, gave a furtive look, and stepped back away from the door. When asked, "Is she in here?" Wilson merely sat down on the bed without responding. Officer Toth testified that he believed that "something wasn't right," and he entered the room, calling for LM, and identifying himself as part of the police department. Officer Toth quickly checked the bathroom for LM with a flashlight and, as he turned around, he saw LM's dead body on the floor between the head of the bed and the wall. The officers then placed Wilson under arrest. Although the police did not have a warrant to enter the motel room, Officer Toth testified that he believed that there was a medical emergency in the room on the basis of his experience and the surrounding circumstances.

The facts, as described, were enough for Officer Toth to reasonably believe that LM was in the room and may need immediate aid, particularly in light of Wilson's evasive response, the condition and contents of the room, LM's vulnerability as reported by her family, and her family's evident concern for her wellbeing. As the trial court correctly ruled, the police had an objectively

reasonable basis to conclude that LM was with Wilson in the motel room and needed immediate aid or assistance.

Our conclusion is also supported by our caselaw. In *Hill*, 299 Mich App at 409-410, this Court considered law enforcement's warrantless entry into a defendant's house to perform a welfare check after his neighbor raised concerns about the defendant's wellbeing. The neighbor told police that she typically saw the defendant's car come and go on a regular basis, but she had not seen it leave his driveway for several days. *Id*. at 407. The neighbor also reported that she usually heard the defendant working in his house at night, but had not heard him for several nights, although she noticed that the lights inside his house were on. *Id*. When the police arrived at the house, they saw that a light was on inside the house, there was recent mail inside the mailbox, and there was a phonebook on the front porch. *Id*. Police also observed that the defendant's car was cold, sitting in his driveway, and that some leaves had collected on it. *Id*. The officers knocked on the defendant's door and windows several times, called his home phone number, and yelled out his name, but received no answer. *Id*. 407-408. Eventually, the officers entered the home to perform a welfare check without a warrant and found evidence of marijuana manufacturing. *Id*. at 408.

The *Hill* Court held that the officers did not violate the defendant's Fourth Amendment rights by entering his house without a warrant because the totality of the circumstances indicated that the defendant needed assistance. *Id*. at 409-410. The Court explained:

> Given the reasonable conclusion that defendant might have been in the home (the lights were on and the car was parked outside), and considering the lack of response to the police officers' aggressive efforts to communicate, it was reasonable to conclude that defendant was not only present but in need of attention, aid, or some kind of assistance. This becomes even more apparent when one considers the presence of the phonebook on the porch and the few days of mail that had accumulated in the mailbox. Moreover, the neighbor had informed the officers that she was worried about defendant and that the situation at defendant's home was unusual. When all the pieces of information are considered together and not individually, the sum of their parts equates to specific and articulable facts that would lead an officer to reasonably conclude that defendant was in need of aid. [*Id*. at 410.]

In *People v Lemons*, 299 Mich App 541, 543; 830 NW2d 794 (2013), police officers went to the defendant's condominium because of a report that his front door was open and blowing in the wind. When the police arrived, they confirmed that the door was open, but did not see any damage to the door to suggest it was broken down. *Id*. The officers announced their presence, knocked several times, and rang the doorbell, but no one responded. *Id*. The officers entered without a warrant to secure the residence and determine whether anyone was inside, and eventually found marijuana and cocaine. *Id*. at 543-544. The police maintained that they entered the condominium because they feared that a home invasion had occurred and that there could be victims or suspects inside. *Id*. at 547.

This Court in *Lemons* ruled that the officer's entry into the home fell within the emergency-aid exception to the warrant requirement. *Id*. The Court explained that "[a]n open door to a

residence was particularly unusual considering that it was noon, on a weekday afternoon in November in Michigan." *Id*. According to the Court, "[t]he fact that there was no damage to the door was of little significance, as it was consistent with the officers' experience that home invasions occurred without damage to the door." *Id*. The Court also emphasized the fact that no one answered the door when they announced their presence numerous times. *Id*. at 548. The Court ultimately held that "[i]t was reasonable for the police officers . . . to enter the home to ensure that anyone in need of emergency aid would receive assistance." *Id*.

Comparing this case to *Hill* and *Lemons*, the facts in this case gave police a much stronger indication that LM was inside the motel room and in need of emergency aid. Officer Toth had substantial, articulable facts to support his belief that LM might need immediate medical assistance on the basis of her not being reachable by her family for several days, her status as a vulnerable missing person with a severe alcohol addiction, her family's report that she was with Wilson, the family's efforts to locate LM based on their urgent concern about her welfare, the state of the motel room including the many alcohol containers throughout, and Wilson's demeanor when police asked about LM's whereabouts. Officer Toth acted reasonably to see if LM needed immediate assistance and, contrary to Wilson's assertions, Officer Toth's entrance was premised on articulable facts, not speculation. As this Court explained in *Lemons*:

> [T]here was a very real possibility that someone could have been inside who needed police assistance. In such a scenario, there would be consternation in the community if the officers turned and left the residence without further investigation. In such a situation, the criticism of the officers would be justified, as the public relies on the police to help in emergencies. Outrage with such a scenario would be further proof that the police officers acted reasonably in entering the condominium in this case. [*Lemons*, 299 Mich App at 549.]

Accordingly, Officer Toth's warrantless entry into the motel room was justified under the emergency-aid exception to the warrant requirement and the trial court did not err when it denied Wilson's motion to suppress the evidence obtained as a result of this entry.

Moreover, even if the emergency-aid exception did not apply to these facts, exclusion of evidence would be unwarranted. "The exclusionary rule is a harsh remedy designed to sanction and deter police misconduct where it has resulted in a violation of constitutional rights . . . ." *People v Frazier*, 478 Mich 231, 247; 733 NW2d 713 (2007) (cleaned up). Therefore, the proper inquiry into whether evidence should be suppressed under the exclusionary rule is whether suppression would deter police misconduct. *Id*. at 248. In both *Hill* and *Lemons*, this Court explained that, when an officer possesses a good-faith belief that emergency aid necessitated a warrantless entry, exclusion of evidence obtained without a warrant is an inappropriate remedy. *Hill*, 299 Mich App at 411-414; *Lemons*, 299 Mich App at 549-550. This is because, "[r]ather than deterring misconduct, applying the exclusionary rule in this case 'would only deprive citizens of helpful and beneficial police action.' " *Lemons*, 299 Mich App at 550, citing *Hill*, 299 Mich App at 414.

In this case, Officer Toth entered the motel room because he feared that LM was inside and there may have been "a medical or emergency situation," and the trial court specifically found that, on the basis of his testimony and other supporting evidence, his actions were based on a good faith

belief that LM needed aid. Because the record clearly supports this finding, even if the emergency-aid exception did not apply, the exclusionary rule did not apply to evidence discovered in the motel room. Accordingly, for this additional reason, the trial court correctly denied Wilson's motion to suppress evidence from the motel room.

### III. MOTION TO SUPPRESS STATEMENTS

Defendant argues that the trial court erred when it denied his motion to suppress statements he made while in custody because police officers deliberately prolonged his pre-arraignment detention. Again, we disagree.

### A. LEGAL PRINCIPLES

An arraignment must be conducted "without necessary delay," MCL 764.26, and a delay of more than 48 hours between an arrest and arraignment, absent unusual circumstances, is presumptively unreasonable, *Riverside Co v McLaughlin*, 500 US 44, 56-57; 111 S Ct 1661; 114 L Ed 2d 49 (1991). When police delay arraignment by more than 48 hours, the burden shifts "to the government to show the existence of a bona fide emergency or other extraordinary circumstances." *People v Manning*, 243 Mich App 615, 631; 624 NW2d 746 (2000). But an "unnecessary delay does not require automatic suppression" of a defendant's statement while in police custody. *Id*. at 643. As this Court explained in *Manning*, relying on our Supreme Court's ruling in *People v Cipriano*, 431 Mich 315; 429 NW2d 781 (1988):

> It is *not* automatic that evidence obtained during a Fourth Amendment violation must be excluded. When a confession was obtained during an unreasonable delay before arraignment, in Michigan the *Cipriano* factors still must be applied. The unreasonable delay is but one factor in that analysis. The longer the delay, the greater the probability that the confession will be held involuntary. At some point, a delay will become so long that it alone is enough to make a confession involuntary. [*Manning*, 243 Mich App at 631 (emphasis in original).]

The *Cipriano* Court explained that a trial court should consider the following factors when determining the voluntariness of a statement:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Cipriano*, 431 Mich at 334.]

"The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness." *Id*. at 334. Thus, "[i]f the totality of the surrounding circumstances indicates that

a [statement] was voluntarily given, it shall not be excluded from evidence solely because of prearraignment delay." *Id*. at 319.

## B. DISCUSSION

We hold that the trial court correctly ruled that Wilson's statements about his strangulation of LM are admissible because, considering the totality of the circumstances, Wilson's statements were plainly voluntary. At the time of his interview on June 14, 2022, Wilson was a healthy adult with no physical or cognitive impairments. Although Wilson's highest educational level is unclear from the record, he does not allege that any lack of education made his statements involuntary. The record also reflects that Wilson attended at least some high school because he told officers that he met LM there. The prosecutor also charged Wilson as a habitual offender for his previous felony convictions. Although the record does not reveal the full extent of those crimes, Wilson had significant experience with law enforcement that informed his choice about whether to speak with police.

In addition, police officers advised Wilson of his *Miranda* rights on two separate occasions, and Wilson signed a written waiver of those rights. Before the June 14, 2022 interview, Detective Twardesky asked Wilson if he had questions about his *Miranda* rights, and Wilson expressly told the interviewing officers that he understood his rights and that he wanted to speak with the police. The length of the interview was an hour and a half, which was not excessively long, and the interview occurred at around 10:30 a.m. Nothing in the record suggests that Wilson was injured, intoxicated, in poor health, or was physically abused or threatened with physical abuse at the time of the interview. Nor was there evidence that the police deprived Wilson of food, sleep, or medical attention before the interview. These factors, combined with Wilson's age, education, and previous experience with law enforcement, support the trial court's holding that Wilson understood the consequences of telling police officers about his role in LM's death, and that his statements were voluntary.

We are cognizant that police detained Wilson for almost three days before he made his challenged statement, and the delay between his arrest and arraignment was presumptively unreasonable. See *Manning*, 243 Mich App at 631. Nonetheless, this factor did not outweigh the evidence that Wilson knew his rights, understood his choice to speak with police, and decided to confess that he caused LM's death. The totality of the circumstances clearly show that Wilson's statements were "freely and voluntarily made." See *Cipriano*, 431 Mich at 334.

Wilson argues that the police deliberately delayed his arraignment so that Detective Twardesky, a more experienced officer, could interview him, which he contends should render his statements inadmissible. According to Wilson, the United States Supreme Court specifically prohibited this type of delay in *Riverside Co*, when the Court explained that "[e]xamples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Riverside Co*, 500 US at 56. However, in this case, the trial court made no finding that any delay was deliberate, nor did the court find that the police engaged in misconduct by delaying his arraignment. Instead, the trial court correctly held that "a delay, whether unnecessary or not, is only one factor that this Court should consider in determining whether to suppress his statements to Detective Twardesky." As discussed, this Court in *Manning* held that a *Riverside Co* violation

does not require "an automatic suppression of an inculpatory statement given to police." *Manning*, 243 Mich App at 642. Rather, this Court ruled that "the better approach is to consider the violation as a factor in evaluating the overall voluntariness of the statement." *Id*. After applying the *Cipriano* factors, we hold that the trial court correctly ruled that, despite a pre-arraignment delay, Wilson's statements were voluntary and admissible.

Affirmed.


/s/ Thomas C. Cameron
/s/ Kirsten Frank Kelly
/s/ Kristina Robinson Garrett