[Crim. No. 19989. First Dist., Div. One. May 1, 1980.]

THE PEOPLE, Plaintiff and Appellant, v.
PAULA JEAN STAMPER, Defendant and Respondent.

COUNSEL

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson, Jr., and Morris Lenk, Deputy Attorneys General, for Plaintiff and Appellant.

James C. Hooley, Public Defender, and Jay B. Gaskill, Assistant Public Defender, for Defendant and Respondent.

OPINION

ELKINGTON, J.—The People appeal from the superior court's order, made pursuant to Penal Code section 995, dismissing an information charging Paula Jean Stamper with two Health and Safety Code controlled substance violations, and alleging two prior convictions of such offenses.

The issue presented is whether the magistrate's finding of no Fourth Amendment taint, in the seizure of controlled substances essential to a

successful prosecution of Ms. Stamper, was supported by substantial evidence.

■ And: "It is fundamental that on a dismissal motion under Penal Code section 995 the superior court may not reweigh evidence, or draw inferences contrary to those reasonably drawn by the magistrate. This rule applies with equal effect where the issue resolved by the magistrate relates, as here, to the Fourth Amendment. Our function, then, is simply to determine if there is any substantial evidence in support of the *magistrate's* conclusion, not that of the *superior court*." (*People* v. *O'Leary* (1977) 70 Cal.App.3d 323, 328 [138 Cal.Rptr. 667].)

The evidence before the superior court was, of course, that adduced before the magistrate at Ms. Stamper's preliminary hearing. Considered in the light most favorable to the magistrate's determination, it established the following.

The City of Fremont's police headquarters received a citizen's report: "[T]here's been two shots gone off within the last hour...at 38220 Hastings Street....One went off at five to 8:00, and one went off about ten minutes ago." The caller then responded "Yes" to the officer's inquiry, "You just heard shots come from that house?" Several police officers responded to the scene. One went to the premises' front door, while the others took positions around the house. After knocking, without response, at the door the officer was informed that one of the others had "heard from within the residence what sounded to be like a shotgun being chambered," as where "a round is transferred into the firing chamber, made by a shotgun or some rifles, a sliding action." Soon a woman's voice from inside asked the officer at the front door who it was. Upon the officer's response, the door was opened. The woman was asked to step outside and keep her hands in plain view and was pat-searched, as a safety precaution. A man then appeared and the officer repeated the procedure. The two were then told of the officers' reasons for being there, and were advised that "we are going to check...the residence and check for any victims due to the emergency doctrine." He "asked if there was anyone else in the residence, to which they stated no." The officer then shouted "inside the residence at the front door...to anyone that may be there that I was entering the residence."

Two officers then "entered the residence and checked for any gunshot victims." While so checking, an officer who was trained in the investigation of narcotic violations, entered the kitchen where in plain view, he

observed what appeared to him to be, and which were, narcotic para-
phernalia and a substantial quantity of narcotics. And under the
kitchen table was observed "an unexpended rifle round...." Finding no
person in the kitchen, the officer did not stop, and proceeded to look
elsewhere in the house. No injured or other person was found. Ms.
Stamper and her male companion were placed under arrest for posses-
sion of narcotics and they and the officers left the house which was
"frozen" until a search warrant could be obtained. Such a search war-
rant was issued, and the ensuing search revealed several pounds of
marijuana, a substantial quantity of cocaine, and narcotic parapherna-
lia. Also found were a live and a spent rifle cartridge, and a loaded rifle
of the same caliber.

No contention is made, nor does the evidence support a theory, that
the officers in entering the house and searching its rooms acted other
than in good faith in seeking persons who might have been injured by
the reported gunshots.

It is, of course, settled law that a police officer, situated where
he has a right to be, may constitutionally observe evidence of crime
within his plain view. (*Lorenzana* v. *Superior Court* (1973) 9 Cal.3d
626, 634 [108 Cal.Rptr. 585, 511 P.2d 33]; *Dillon* v. *Superior Court*
(1972) 7 Cal.3d 305, 310 [102 Cal.Rptr. 161, 497 P.2d 505]; *Mozzetti*
v. *Superior Court* (1971) 4 Cal.3d 699, 707 [94 Cal.Rptr. 412, 484
P.2d 84].)

The narrowed issue is whether the magistrate, at Ms. Stamp-
er's preliminary examination might *reasonably conclude*, under the
facts we have related, that the police officers were constitutionally au-
thorized, under the circumstances, to institute a search of the premises
for injured persons. It is not, as earlier pointed out (see *People* v.
*O'Leary, supra*, 70 Cal.App.3d 323, 328), whether the superior court
might reasonably have reached a contrary conclusion.

We may assume, at least arguendo, that the person making the re-
port to police headquarters was an untested, and thus unreliable,
informant. (See *Alexander* v. *Superior Court* (1973) 9 Cal.3d 387, 395
[107 Cal.Rptr. 483, 508 P.2d 1131].) But we entertain no doubt that
the well-known sliding metallic sound of a cartridge "being chambered"
for firing in a gun, heard by one of the responding police officers added
sufficient credibility to the earlier anonymous report. The officers thus
had probable cause to believe that gunshots had a short time before

been fired within Ms. Stamper's home, and that even after their arrival someone had chambered a cartridge for yet another firing.

Guns are not ordinarily fired, or prepared for firing, within a home unless aimed at a living target. ■ The officers reasonably concluded that an injured person in need of prompt attention *might* be within the house. In such situations the Constitution does not require the delays of further investigation or warrant applications.

■ "'[E]xigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life. . . . There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*People* v. *Ramey* (1967) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333] (cert. den. 429 U.S. 929 [50 L.Ed.2d 299, 97 S.Ct. 335].)

■ What is reasonable where a firearm is being used, or misused, "'must be tested by different standards from those which apply to other objects.'" (*People* v. *Jordan* (1976) 55 Cal.App.3d 965, 967 [128 Cal.Rptr. 147].) And where police officers reasonably believe that someone inside a house may be "in distress and in need of assistance": "Necessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary for that purpose." (*People* v. *Roberts* (1956) 47 Cal.2d 374, 377 [303 P.2d 721].) We opine, as in *People* v. *Flores* (1974) 12 Cal.3d 85, 91-92 [115 Cal.Rptr. 225, 524 P.2d 353], that a failure of the police to investigate as they did, "would have constituted a failure to properly discharge [their] duties as [officers] of the law."

We conclude that the magistrate did not, and that the superior court did, err in their respective rulings.

The order dismissing the information is reversed.

Racanelli, P. J., and Grodin, J., concurred.