Filed 7/18/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ADAN RUBIO,<br><br>        Defendant and Appellant. | A152455<br><br>(San Mateo County<br>Super. Ct. No. 16-SF-012681-A) |

Defendant Adan Rubio appeals his conviction by plea to possession of a controlled substance with a firearm (Health & Saf. Code, § 12305), a plea entered after the trial court denied his motion to suppress the evidence found in his apartment (Pen. Code, § 1538.5).[1] Police had forcefully entered the apartment after responding to the scene where 11 gunshots had just been fired and officers were concerned that a shooting victim or suspect might be inside. We agree with the magistrate and the lower court that under the circumstances the warrantless entry was justified under the so-called community caretaking exception to the Fourth Amendment warrant requirement, and that the suppression motion was properly denied. We shall therefore affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On October 19, 2016, at approximately 10:40 p.m., East Palo Alto Police Department Sergeant Clint Simmont received an alert on his "ShotSpotter" application that shots had been fired near 2400 Gonzaga Street. ShotSpotter triangulates the location of gunfire via microphones placed throughout the city. ShotSpotter notified Sergeant Simmont of two separate bursts of gunfire. First came five rounds from the edge of the

---

[1]        Unless otherwise specified, all further statutory references are to the Penal Code.

garage driveway area of 2400 Gonzaga, then one minute later came six rounds at "the edge of the driveway, near the sidewalk." Sergeant Simmont testified that 2400 Gonzaga is located in "Da Vill," known as a high-crime neighborhood. He further testified that he had responded to more murders within a block of that location than anywhere else in East Palo Alto.

Sergeant Simmont and a team of four other officers arrived near the location of the shots and parked 60 to 70 feet from the edge of the driveway. Officers Andrea Dion and Rock Stilwell spoke with persons nearby and asked if they had heard gunfire. Two individuals pointed towards a boat in the driveway of 2400 Gonzaga and stated that they saw flashes coming from the other side of the boat. As the officers approached the house with their guns out, they found a spent shell casing on the ground at the top of the driveway near the garage. Sergeant Simmont believed the casing was a .45 caliber round and may have come from a semiautomatic weapon.

Approximately one minute after the officers found the spent shell casing, a man identified as Joshua Bazan walked through the wooden gate of a fence that separated the front and back yards of the house. Sergeant Simmont recognized Bazan from prior contacts and testified that Bazan frequently drinks and yells at police. Sergeant Simmont also testified that Bazan did not reside at 2400 Gonzaga. As he came through the gate, Bazan began yelling obscenities at the officers and assumed a combative position. The officers arrested Bazan and placed him in a patrol car.

After Bazan's arrest, Officer Dion located two additional spent casings behind the open gate that Bazan had passed through. Sergeant Simmont concluded the gunfire had come from near the gate, although he could not testify from which side. Sergeant Simmont testified that he was "investigating whether or not we had a victim or a shooter [who] was hiding out."

Sergeant Simmont pounded loudly on a door attached to the side of the garage and announced police presence four or five times. No one responded, but Sergeant Simmont heard what sounded like someone inside the garage pushing items against the door, and he noticed that the door appeared to be flexing. Sergeant Simmont believed someone was

attempting to barricade the door. As Sergeant Simmont was knocking on the door, a man later identified as Sergio Castillo came to a window next to the garage. Sergeant Simmont ordered Castillo to open the door. Castillo indicated that the door was not the door to the garage, but instead was a door to a separate room.

Sergeant Simmont, Officer Lee, and Officer Weigand spoke with several persons at the front door to the residence. When asked whether anyone in the house had been shot, defendant's father, Francisco Rubio Sr., stated he did not know. Sergeant Simmont testified that he asked Francisco Sr. for permission to search the house, which Francisco Sr. granted. Francisco Sr. testified that the officers never asked him for permission to enter the house.

Once inside the house, officers asked Francisco Sr. who was inside the garage, and he responded that his son was. Sergeant Simmont then asked for permission to search the garage, and Francisco Sr. responded, "Sure." Attempting to open the door from the house to the garage, Francisco Sr. found that it was locked, but told the officers he would get the key.

As Francisco Sr. was getting the key, defendant emerged from the garage, opening the door "just enough to slide his body out." Defendant closed the door, which automatically locked behind him, and approached the officers with his hands in his pockets, yelling for them to shoot him. Sergeant Simmont repeatedly ordered defendant to show his hands. Defendant eventually took his hands out of his pockets and, as he did so, threw a key ring into the kitchen sink. Officers arrested defendant and placed him in a patrol car.

The officers retrieved the key defendant had thrown into the sink and attempted to use it to open the door to the garage. When defendant's key did not work, Sergeant Simmont and Officer Stilwell kicked the door open and entered the garage. Sergeant Simmont testified that he was uncertain what was on the other side of the door and that he had no reason to believe anyone had been shot, but he "didn't have anything to rule that out, either."

3

Upon entering the garage, Sergeant Simmont observed that the garage was a converted apartment. The officers did not find anyone inside the apartment, but did observe "an explosive device on a shelf." The officers also found and collected an operable .45 semiautomatic Smith & Wesson pistol on the shelf in an open closet. Sergeant Simmont noticed that the door he had knocked on earlier from the outside was barricaded by furniture.

The officers cleared the house of all occupants to secure the scene. At around 5:18 a.m., a search warrant was obtained. The officers reentered the residence and executed the warrant. The officers found an operable .357 Smith & Wesson handgun, twenty .40-caliber bullets, 87 live .357-caliber bullets, a body armor vest, six spent .357 Smith & Wesson shell casings, and a plastic twist-off bindle in a shot glass with a clear, rock-like substance. Sergeant Simmont located surveillance equipment with a view of the driveway and a video that showed three people walking down the driveway. Defendant is seen pulling out a revolver and firing six shots into the air. Defendant and two other individuals, Bazan and possibly defendant's brother, are then seen running back through the gate next to the house.

Following the filing of a five-count felony complaint, defendant filed a motion to suppress evidence. At a hearing on the motion to suppress, the prosecution argued that the warrantless entry into defendant's garage was justified under multiple theories: community caretaking, emergency aid, exigent circumstances, and consent. Citing to *People v. Ray* (1999) 21 Cal.4th 464, the magistrate ruled that the search satisfied the community caretaking exception, but noted that it was "a very close case." The court denied the motion to suppress.

The San Mateo County District Attorney then filed a six-count felony information, charging defendant with discharge of a firearm with gross negligence (§ 246.3, subd. (a) (count one)), possession of a controlled substance with a firearm (Health & Saf. Code, § 11370.1, subd. (a) (count two)), unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1) (counts three and four)), unlawful possession of ammunition (§ 30305, subd. (a)(1) (count five)), and possession of an explosive (Health & Saf. Code, § 12305

4

(count six)), with a special allegation that defendant is ineligible for probation because of two prior offenses (§ 1203, subd. (e)(4)).

Defendant filed a motion to set aside the information pursuant to section 995, alleging that the evidence presented at the preliminary hearing should have been suppressed pursuant to section 1538.5. Defendant also renewed the original motion to suppress evidence. Citing the emergency aid doctrine of the community caretaking exception, the trial court denied defendant's motion to set aside the information and denied the motion to suppress.

Following this second denial of his motion to suppress, defendant entered a plea of no contest to violating Health and Safety Code section 11370.1, as charged in count two, and admitted the special allegation pursuant to section 1203, subdivision (e)(4). The trial court sentenced him to three years of supervised probation, subject to conditions including nine months in the county jail or a residential substance abuse treatment program. Defendant filed a timely notice of appeal.

## DISCUSSION

" '[I]t is a "basic principle of Fourth Amendment law" that searches and seizures inside a home without a warrant are presumptively unreasonable.' " (*People v. Romeo* (2015) 240 Cal.App.4th 931, 939, quoting *Payton v. New York* (1980) 445 U.S. 573, 585-586.) " 'Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions.' " (*People v. Troyer* (2011) 51 Cal.4th 599, 602.) "[W]arrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement." (*Kentucky v. King* (2011) 563 U.S. 452, 462.) " '[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.' " (*Id.* at p. 466.)

Defendant argues that the officers' actions here were not justified by any exception to the Fourth Amendment warrant requirement. "On appeal, a reviewing court must affirm the trial court's determinations of the factual questions if they are supported

5

by substantial evidence, but must take the ultimate responsibility for deciding the legal question according to its independent judgment." (*People v. Duncan* (1986) 42 Cal.3d 91, 97.)

In denying defendant's motion to suppress, the magistrate relied on *People v. Ray, supra,* 21 Cal.4th 464.[2] In *Ray,* officers responded to a report that the door to an apartment had been open all day, and that the inside of the home was in "shambles." (*Id.* at p. 468.) Officers arrived on the scene and concluded that there was a " '95 percent' likelihood they had encountered a burglary or similar situation." (*Ibid.*) The officers knocked several times and announced their presence, but received no response. Concerned that they might find people inside either in need of aid or burglarizing the home, the officers entered the home to conduct a security check.

Six members of our Supreme Court agreed that the entry was proper but disagreed among themselves as to precisely which exception to the warrant requirement applied. Three justices felt that the relevant exception was "exigent circumstances," defined " 'to include "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property . . . ." [Citation.] The action must be "prompted by the motive of preserving life or property and [must] reasonably appear[] to the actor to be necessary for that purpose." ' " (*People v. Ray, supra,* 21 Cal.4th at p. 481 (conc. opn. of George, C.J.).) The lead opinion of three other justices, viewing the emergency aid doctrine as "a subcategory of the community caretaking exception, a distinctly different principle of Fourth Amendment jurisprudence" (*id.* at p. 471 (lead opn. of Brown, J.)), concluded that the broader community caretaker exception applied.

According to the lead opinion, " 'the community caretaker exception is only invoked when the police are not engaged in crime-solving activities.' " (*People v. Ray, supra,* 21 Cal.4th at p. 471.) "Under the community caretaking exception, circumstances short of a perceived emergency may justify a warrantless entry." (*Id.* at p. 473.)

---

[2] We review the propriety of the magistrate's decision, not that of the superior court that affirmed the magistrate's decision. (*People v. Thompson* (1990) 221 Cal.App.3d 923, 940; *People v. Stamper* (1980) 106 Cal.App.3d 301, 304.)

" 'Community caretaking activities are varied and are performed for different reasons.' [Citation.] Each variant must be assessed according to its own rationale on a case-by-case basis. 'Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place.' " (*Id.* at p. 472.)

Given the generality of this standard, it is hardly surprising that courts in many cases with diverse factual situations have upheld and rejected application of the community caretaking exception. One element common to all of these cases is that the law enforcement officers must not have used the caretaking exception as a pretext for other law enforcement activities. " '[T]he defining characteristic of community caretaking functions is that they are totally unrelated to the criminal investigation duties of the police.' " (*People v. Ray, supra,* 21 Cal.4th at p. 471.) If an entry into a home is justified by the caretaking exception, there is no bar to the seizure of contraband that is readily observed upon entry into the home. (*Id.* at pp. 471-472; *People v. Stamper, supra,* 106 Cal.App.3d at p. 305.) In the present case, there is no suggestion that the officers who entered defendant's home were looking for contraband or doing anything other than attempting to ensure that inside there was not an injured victim or someone with a weapon who was then threatening injury to others. (*Ray, supra,* at p. 471.)

While the facts in none of the cases are precisely the same, several support application of the community caretaking exception here. In *Ray* itself, the officers were aware only that a door to the residence had been open all day and that through it could be seen that the home was in shambles, and no one responded to their repeated knocks. Their concern justified entry to conduct a security check " 'to see if anyone inside might be injured, disabled, or unable to obtain help' and to determine whether a burglary had been committed or was in progress." (*People v. Ray, supra,* 21 Cal.4th at p. 468.) In *Stamper,* which the trial court here found more persuasive, police responded to gunshots fired within a home, heard what sounded like a shotgun being chambered, were told by the two residents who emerged that no one else was inside, but nonetheless entered the residence to " 'check for any victims due to the emergency doctrine.' " (*People v.*

*Stamper, supra,* 106 Cal.App.3d at p. 304.) The Court of Appeal observed, "Guns are not ordinarily fired, or prepared for firing, within a home unless aimed at a living target. The officers reasonably concluded that an injured person in need of prompt attention *might* be within the house. In such situations the Constitution does not require the delays of further investigation or warrant applications." (*Id.* at p. 306, italics in original.)

Several decisions of the United States Supreme Court confirm this approach. In *Brigham City v. Stuart* (2006) 547 U.S. 398, police officers responded to a loud party at a residence where they observed through a window four adults attempting to restrain a juvenile who broke free and struck one of the adults. The officers' uninvited entry into the house was deemed unjustified by the Utah Supreme Court, but the United States Supreme Court held "the officers' entry was plainly reasonable under the circumstances. . . . [¶] The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." (*Id.* at p. 406.) This decision was relied on in *Michigan v. Fisher* (2009) 558 U.S. 45 (per curiam), where officers entered a home without consent or a warrant after observing signs of an altercation and a person inside the home "screaming and throwing things," refusing to answer the officers' knocks, and responding to inquiries whether he needed medical attention because of a cut on his hand by demanding "with accompanying profanity, that the officers go to get a search warrant." (*Id.* at p. 46.) In reversing the decision of the Michigan courts finding no emergency, the higher court held "[i]t was error for the Michigan Court of Appeals to replace that objective inquiry into appearances with its hindsight determination that there was in fact no emergency. It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one they encountered here." (*Id.* at p. 49.) Quoting from *Brigham City* that "[t]he role of a peace officer includes preventing violence and restoring order," the court held that "[i]t sufficed to invoke the emergency aid exception that it was reasonable to believe that Fisher hurt himself (albeit nonfatally) and needed treatment that in his rage he was unable to provide, or that Fisher was about to hurt, or had already hurt, someone else." (558 U.S. at p. 49.)

8

In *Ryburn v. Huff* (2012) 565 U.S. 469 (per curiam), a case applying 42 United States Code section 1983, police officers pursuing rumors that a high school student absent from school for two days had threatened to "shoot up" the school, sought to interview the student at his home. (*Ryburn,* at p. 470.) Their knocking at the door of the home and phone calls to the home phone initially went unanswered. When the student's mother was contacted on her cell phone and acknowledged that she and the student were inside the home, and was told that the officers wished to speak with her, she "hung up the phone." (*Id.* at p. 471.) After one or two minutes, the two came to the front steps of the home and refused the officers permission to speak with them inside the house. (*Ibid.*) When asked if there were any guns in the house, the mother "responded by 'immediately turn[ing] around and [running] into the house' " and officers without permission followed her into the house. In reversing a split decision of the Ninth Circuit Court of Appeals holding that those officers were not entitled to qualified immunity, the court upheld the district court's conclusion that the mother's "odd behavior, combined with the information the officers gathered at the school, could have led reasonable officers to believe 'that there could be weapons inside the house, and that family members or the officers themselves were in danger.' " (*Id.* at p. 472.) Referring to *Brigham City* and other decisions, the court held that "[a] reasonable police officer could read these decisions to mean that the Fourth Amendment permits an officer to enter a residence if the officer has a reasonable basis for concluding that there is an imminent threat of violence." (*Ryburn*, at p. 474.) Rejecting the significance of the fact that when the mother fled into the house she "was under no legal obligation to continue her conversation with the police," the court observed, "it should go without saying . . . that there are many circumstances in which lawful contact may portend imminent violence." (*Id.* at p. 476.) And further, "it is a matter of common sense that a combination of events each of which is mundane when viewed in isolation may paint an alarming picture." (*Id.* at pp. 476-477.) Most importantly, the court criticized the circuit court for "not heed[ing] the District Court's wise admonition that judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation. With the

9

benefit of hindsight and calm deliberation, the panel majority concluded that it was unreasonable for petitioners to fear that violence was imminent. But we have instructed that reasonableness 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and that '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving.' [Citation.] Judged from the proper perspective of a reasonable officer forced to make a split-second decision in response to a rapidly unfolding chain of events that culminated with [the mother] turning and running into the house after refusing to answer a question about guns, petitioners' belief that entry was necessary to avoid injury to themselves and others was eminently reasonable." (*Id.* at p. 477.)

Although in the present case the officers were not aware of a specific, known individual who might be in danger or might pose an imminent threat to others, as in some of these cases, the California Supreme Court's decisions in both *Ray* and *Stamper* establish that if the circumstances suggest that such a person may be inside a dwelling, police may reasonably enter to determine whether in fact such a person is present.

Under the approach required by these authorities, the officers' forced entry into defendant's garage apartment in the present case was reasonable. As the prosecutor and the Attorney General have summarized the situation, "1) there were shots fired from multiple locations in the driveway; 2) a verbally aggressive person exited the gate of the residence and took a fighting stance; 3) Sergeant Simmont recognized that the person did not live at the residence; 4) shell casings were observed outside the residence; 5) the shell casings appeared to lead to a door going into the garage; 6) when he knocked and announced his presence, Sergeant Simmont heard movement inside that sounded like someone barricading the door; 7) the sounds led officers to believe someone may have been held captive on the other side of the door; 8) [defendant] was acting erratically and refused to show his hands; and 9) the neighborhood was known as a high crime area."

As the trial court put these facts together, "what the defense is asking is for this court to second guess the actions of an officer in the field who knows that shots have

10

been fired, sees physical evidence of the location where the firearm was discharged, hears movement within the home that he seeks entry to that is consistent with a reasonable fear that a victim of a shooting may be being secreted within the residence based on his prior experience, further that that activity to barricade the door was upon his request to enter as opposed to a verbal response saying, no, you can't come in. There's physical activity suggesting an attempt to barricade the door. And then the appearance of Mr. Bazan . . . and his oppositional behavior in a manner where he had no right of possession over the premises . . . heightened the exigent moment with regard to the decision making an officer must make in the field where firearms are being or have very recently been discharged. Accordingly, . . . Sergeant Simmont's actions fall within the emergency [aid] doctrine [of the] community caretaking exception to the Fourth Amendment warrant requirement."

We agree with this analysis. In our view, the community caretaker exception applies. We add, as the Court of Appeal did in *People v. Stamper, supra,* 106 Cal.App.3d at page 306: "a failure of the police to investigate as they did, 'would have constituted a failure to properly discharge [their] duties as [officers] of the law.' "

## DISPOSITION

The judgment is affirmed.

_____
POLLAK, P. J.

I CONCUR:

_____
BROWN, J.

11

**TUCHER, J., Dissenting.**

If a man lives in a high crime neighborhood and somebody discharges a firearm *outside* his home, may the police break down his door and enter his apartment when he refuses to invite them in to investigate? The majority seems to think so, but the Fourth Amendment answers a resounding "no"—at least not without circumstances, not present here, that would cause a reasonable person to believe that someone in the apartment stood in need of aid, or that some other exception to the warrant requirement applied.

The Fourth Amendment draws a " 'firm line at the entrance of the house.' " (*People v. Bennett* (1998) 17 Cal.4th 373, 386, citing *Payton v. New York* (1980) 445 U.S. 573, 590.) At the amendment's "very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (*Silverman v. United States* (1961) 365 U.S. 505, 511.) Thus, "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." (*Kyllo v. United States* (2001) 533 U.S. 27, 31 (*Kyllo*).)

The Attorney General urges two exceptions to the Fourth Amendment's warrant requirement as justifying the warrantless intrusion in this case, but he is wrong on both counts. The emergency aid exception of *People v. Ray* (1999) 21 Cal.4th 464 (*Ray*) does not apply because the police had no reasonable basis to conclude there was anybody inside the apartment who was in danger or distress. And the exigent circumstances exception fails independently to justify the forced entry because there was no probable cause to believe that a shooting suspect was in the apartment.

## I.     *Emergency Aid Doctrine*

The emergency aid exception to the warrant requirement allows police to "enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." (*Brigham City v. Stuart* (2006) 547 U.S. 398, 400 (*Brigham City*); accord *People v. Troyer* (2011) 51 Cal.4th 599, 606 (*Troyer*).) In determining whether an officer acted reasonably, " 'due weight must be given not to his unparticularized suspicions or " 'hunches,' " but to the reasonable inferences which he is entitled to draw from the facts in light of his

1

experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary.' " (*People v. Duncan* (1986) 42 Cal.3d 91, 97–98 (*Duncan*); accord *Terry v. Ohio* (1968) 392 U.S. 1, 23.)

Missing in this case are specific and articulable facts that would lead a reasonable person to conclude shots fired *outside* defendant's garage apartment required breaking down the door to rescue someone *inside* his home. Shotspotter data and percipient witness observations placed all of the gunfire outside the home, in or near the driveway and the gate to the backyard. There were no bullet holes in windows or siding to suggest that any of the shots fired outside the home had penetrated into the garage. There were no drops of blood on the ground to suggest anybody in range of the gunshots had been hit. Police talked to eyewitnesses but heard no reports of a scuffle, or of any other sounds or sights suggesting anyone had been threatened or injured. When police asked Francisco Rubio, Sr. if anyone had been shot, he responded "I don't think so." (Any lack of definitiveness in this answer is easily explained by the fact that he had been asleep until awoken by the sound of gunfire; getting out of bed to investigate, he saw nobody.)

Other than the simple fact that shots were fired outside defendant's home, the Attorney General points only to the ample evidence that two people in this high-crime neighborhood distrusted the police. First, the response to Sergeant Simmont's pounding on the outside door of defendant's apartment, announcing police presence, was an evident attempt to barricade the door from the inside. Then, a man who did not live at the house and who had a habit of "making his dissatisfaction [with] the police known" emerged from the backyard in a belligerent manner. Finally, defendant responded to the continued police attempts to gain access to his apartment by coming out into the kitchen with his hands in his pockets, daring the police in a loud voice to shoot him.

These facts certainly justify the police in detaining defendant and Joshua Bazan in handcuffs while they continue their investigation, but they do not support an inference that an injured person remains in the garage. Bazan had no reported link to the home, so his presence outside it says nothing about what is happening inside. Is Bazan a friend or foe of the inhabitants? Is he responsible for the shots fired? At this point, the police did

2

not know.  They did know, or at least had strong evidence to suggest, that the only reported occupant of the garage wanted no contact with them, and that he feared police would break down his door and would shoot him.  But defendant's evident distrust of police and preference to avoid interacting with them does not plausibly support an inference that somebody else was in his apartment and suffering from a gunshot wound.  Even after they detained Bazan and defendant, the police learned nothing to substantiate their original suspicion that an injured person might be in the garage.  And with nothing more than an "unparticularized suspicion[]" that emergency aid might be necessary, the police may not breach the firm line the Fourth Amendment draws at the entrance to defendant's home.  (*Duncan*, *supra*, 42 Cal.3d at pp. 97–98.)  They cannot break down his door simply because Sergeant Simmont "didn't have anything to rule . . . out" the possibility that someone inside had been shot.

Unlike the majority, I find no authority in *Ray, supra,* 21 Cal.4th 464, for the forced entry into defendant's apartment.  In fact, a majority of justices in *Ray* conclude that the emergency aid doctrine did not even justify the warrantless entry into an empty apartment in that case.  The first portion of the lead opinion "agree[s] with defendant that the People did not meet their burden of establishing circumstances warranting the officers' actions under the emergency aid component of community caretaking."  (*Id*. at p. 472 (lead opn.).)  Three justices conclude in the lead opinion that, although "[t]he officers were concerned for the possibility of an injured person inside the residence," they "had no knowledge of any facts that would lead a reasonable person in their position to believe entry was immediately necessary to aid life or limb."  (*Id*. at p. 473 (lead opn.).)  Joining them on this point was Justice Mosk, whose dissent found no justification for the warrantless search in *Ray* at all.  (*Id*. at p. 482 (dis. opn. of Mosk, J.).)  Thus, to the extent our case is analogous—and on this point I think it is—*Ray* precludes us from applying the emergency aid doctrine here.  As in *Ray*, so in this case, officers may have been "concerned for the possibility of an injured person" (*id*. at 473 (lead opn.)), but without specific and articulable facts to support an inference that an injured person might be inside the apartment, the emergency aid exception does not authorize warrantless entry.

3

After rejecting the emergency aid doctrine as grounds for police entry into the apparently burglarized apartment in *Ray*, the lead opinion goes on to endorse warrantless entry on a different theory. The opinion accepts the prosecution's argument that there is a non-emergency variant of the community caretaking exception, and that this broader conception of community caretaking excuses the police from having obtained a warrant. (*Ray, supra,* 21 Cal.4th at p. 473 (lead opn.).) "[C]ircumstances short of a perceived emergency may justify a warrantless entry," such as " 'where the police reasonably believe that the premises have recently been or are being burglarized,' " the three justices conclude. (*Ibid.*) On this second holding, Justice Mosk parts company with the lead opinion, rejecting the idea "that the warrantless search of a residence, under nonexigent circumstances, can be justified on the paternalistic premise that 'We're from the government and we're here to help you.' " (*Id*. at p. 482 (dis. opn. of Mosk, J.).)

Not only does the *Ray* lead opinion's second theory fail to command a majority, it has no application to the facts of defendant's case. Here, nobody argues that circumstances short of an emergency required police attention. Sergeant Simmont was not, for example, trying to protect defendant's property from potential burglars. Moreover, the lead opinion in *Ray* teaches that the community caretaking exception only justifies intrusions for purposes other than emergency aid if the police are not investigating a crime. "Any intention of engaging in crime-solving activities will defeat the community caretaking exception even in cases of mixed motives." (*Ray, supra,* 21 Cal.4th at p. 477 (lead opn.).) To the extent the majority finds no evidence in this case that the police went into defendant's garage to investigate a crime, I disagree with its reading of the record. Sergeant Simmont explained that he kicked in defendant's door because he "didn't know what was on the other side" but thought there was "either an armed subject or a victim of gunfire" in the garage. He and his colleagues were investigating a shooting that had just occurred and were looking for potential perpetrators and victims of such a crime. Thus, *Ray*'s non-emergency variant of community caretaking cannot justify this warrantless entry.

4

In sum, the warrantless intrusion into defendant's home finds no authority in *Ray*—neither *Ray*'s application of the traditional emergency aid doctrine nor its new, non-emergency variant of community caretaking. The majority suggests otherwise by quoting language from *Ray*'s lead opinion, that the police's "concern justified entry 'to conduct a security check "to see if anyone inside might be injured, disabled, or unable to obtain help" and to determine whether a burglary had been committed or was in progress.' " (Maj. opn., *ante*, at pp. 7–8.) But the quoted language is the subjective explanation the police gave for their conduct. (See *Ray, supra,* 21 Cal.4th at p. 468 (lead opn.).) As an ostensible conclusion of law, it is one the lead opinion expressly rejects. In *Ray*, as in this case, "the People did *not* meet their burden of establishing circumstances warranting the officers' actions under the emergency aid component of community caretaking" because, although "[t]he officers were concerned for the possibility of an injured person inside the residence," they "had no knowledge of any facts that would lead a reasonable person in their position to believe entry was immediately necessary to aid life or limb." (*Id.* at pp. 472–473, italics added (lead opn.).)

Other California cases applying the emergency aid doctrine are no more helpful to the Attorney General. In *People v. Stamper* (1980) 106 Cal.App.3d 301 (*Stamper*), police responded to a report that two gunshots had been fired *within* a residence. When they approached and knocked on the door, an officer " 'heard from within the residence what sounded to be like a shotgun being chambered.' " (*Id.* at p. 304.) Not surprisingly, the court upheld warrantless entry in that case. (*Id.* at p. 306.) Unlike in our case, where the police break into defendant's apartment without any evidence of a firearm, gunshots, or an injured person within, in *Stamper* the police had evidence that shots had just been fired inside the home, and that somebody inside was again preparing to use a firearm even as the police stood by outside.

Similarly, in *Tamborino v. Superior Court* (1986) 41 Cal.3d 919 (*Tamborino*), the police responded to a report of a robbery at an address where a victim "was believed to be injured and bleeding." (*Id.* at pp. 921–922.) Officers responding to the scene observed blood outside the defendant's apartment building and outside his apartment

5

door.  Also, a witness "confirmed that an injured person was inside the apartment."  (*Id.* at p. 922.)  Unsurprisingly, the court held that these facts gave officers sufficient reason to enter in search of injured persons.  But our case, with no sign of blood and no witnesses reporting injury, is clearly distinguishable.  (See also *Troyer*, *supra*, 51 Cal.4th at p. 610 [emergency aid justifies intrusion where "police arrived minutes after a reported shooting to find one victim with gunshot wounds, another bleeding heavily from a head wound, blood on the door indicating an injured victim had entered or exited the residence, a report of a male shooting victim who may still have been unaccounted for, and evasive or unreliable responses from [one victim] as to whether anyone inside needed assistance"].)

The Attorney General also relies on two federal cases that are distinguishable in that both involve police who see evidence that a person in the home has been injured *and* that violence is ongoing in the home.  In *Brigham City, supra*, 547 U.S. 398, the officers see and hear a fight taking place inside a house, and then watch through a window as one victim takes a punch to the face, spitting blood.  (*Id.* at p. 406.)  In *Michigan v. Fisher* (2009) 558 U.S. 45, officers investigating a report of a man " 'going crazy' " find, in the driveway, blood in and on a pickup truck whose front has been smashed, and more blood on the door to the house.  (*Id.* at p. 45.)  Through a window they see a man "inside the house, screaming and throwing things," perhaps at "a spouse or a child."  (*Id.* at pp. 46, 48.)  That the emergency aid exception justified warrantless entry in these two cases means nothing for our case, where the police forced entry into defendant's home without any evidence that there was an injured person in the apartment, and without evidence that violence was occurring, or had occurred, inside the home.

More analogous is a case from a sister state whose supreme court refused to apply the emergency aid doctrine even where there was evidence linking gunfire to a room the police entered.  In *People v. Davis* (1993) 442 Mich. 1 [497 N.W.2d 910], police dispatch alerted officers that a motel desk clerk had called in "Room 33 or 34 . . . shots fired."  (*Id.* at p. 911.)  Officers reporting to the scene noticed nothing unusual and chose not to speak with the desk clerk or motel manager, "but instead went directly to the rooms," knocking

6

and announcing police presence at the first door they reached. (*Ibid*.) Although the defendant peeked out the window, she did not open the door to her hotel room for three to five minutes. When she did, the police entered the room without a warrant, found contraband, and arrested her. (*Id*. at pp. 911–912.) The Michigan Supreme Court, after carefully analyzing the legal issues, noted the police had no corroboration for the sketchy information they had received from dispatch, and no suggestion "that any person was injured, other than by implication because of the inherently dangerous nature of gunshots." (*Id*. at p. 921.) On these facts, the court rejected application of the emergency aid doctrine, concluding that "the constitution prohibits [police] from forcing entry into a dwelling on the basis of a speculation that someone inside may have been injured." (*Id*. at p. 922.) (See also *United States v. Timmann* (11th Cir. 2013) 741 F.3d 1170 [emergency aid doctrine does not justify police entry into an apartment from which a bullet had earlier pierced neighboring apartment's wall].) The emergency aid doctrine is even less appropriate in defendant's case, where there was never evidence of gunfire within (or emitting from) his home.

The majority cites one case that involves police entry into a home without signs of blood or reports of violence within the home. But *Ryburn v. Huff* (2012) 565 U.S. 469 (*Ryburn*) is not a case in which the court had occasion to decide whether the unwarranted intrusion met Fourth Amendment standards. Rather, it is one in a series of cases in which the United States Supreme Court granted *certiorari* and simultaneously reversed the Ninth Circuit in per curiam opinions because the Ninth Circuit had failed to appreciate that police officers were entitled to qualified immunity in civil cases for damages. (*Id*. at pp. 472, 477; *Brosseau v. Haugen* (2004) 543 U.S. 194, 201; *Stanton v. Sims* (2013) 571 U.S. 3, 10–11; *Kisela v. Hughes* (2018) __ U.S. __ [138 S.Ct. 1148, 1154–1155, 200 L.Ed.2d 449, 456].) This, after the United States Supreme Court had repeatedly emphasized to the Ninth Circuit the importance of the distinction between qualified immunity and a decision on the merits of a constitutional claim. (See, e.g., *Saucier v. Katz* (2001) 533 U.S. 194, 203; *Safford Unified School Dist. No. 1 v. Redding* (2009) 557 U.S. 364, 378–379; *Camreta v. Greene* (2011) 563 U.S. 692, 705–707.) That is,

7

officials are entitled to qualified immunity unless they have "violated a 'clearly established' right," which means that in an appropriate case a court can enter a defense judgment on qualified immunity grounds "without ever ruling on the (perhaps difficult) constitutional claim the plaintiff has raised." (*Id*. at p 705.) Consistent with this distinction, the Court in *Ryburn* held that "reasonable police officers in petitioners' position *could have* come to the conclusion that the Fourth Amendment permitted them to enter the Huff residence" (*Rayburn*, at p. 477, italics added), not that the Fourth Amendment did in fact permit the officers' entry.

Questions of qualified immunity aside, *Ryburn* is also factually distinguishable. In *Ryburn*, the police entered through an open door, behind a woman whose son had credibly threatened to " 'shoot up' " his school, and after the woman ran into the house upon being asked whether there were guns inside. (*Ryburn, supra,* 565 U.S. at pp. 470–471.) Officer safety was a major motivation for the officers' behavior and for the Court's conclusion they were entitled to qualified immunity. (*Id*. at pp. 473–474.) And to the extent the officers were concerned with the safety of family members in the home, they were acting on evidence that linked a person in the home to both criminal threats and available firearms. In defendant's case, the police did not invoke officer safety to justify kicking down defendant's door, and they had no evidence tracing criminal threats or firearms to anyone in defendant's apartment, as the only crime they were investigating occurred *outside* the home and had not been linked to any suspect before the police forced entry.

Although the police had no evidence linking anyone inside defendant's apartment to the reports of shooting outside it, they did have evidence that someone in the garage sought to deny them entry. But defendant, as much as any American, has "the right . . . to retreat into his own home and there be free from unreasonable governmental intrusion." (*Silverman, supra,* 365 U.S. at p. 511.) He should not need a barricade to fortify that right, and in any event furniture pushed against the door is no match for a determined police officer. The hostility that defendant (and Bazan) exhibited toward the police I do not condone. But nor can I ignore that " 'as a practical matter neither society

8

nor our enforcement of the laws is yet color-blind,' " and the resulting "uneven policing may reasonably affect the reaction of certain individuals—including those who are innocent—to law enforcement." (*United States v. Brown* (9th Cir. 2019) 925 F.3d. 1150, 1156) That defendant lived in a high crime neighborhood, that a shooting had just occurred outside his home, and that he chose initially to exercise his constitutional right to be left alone in his own apartment do not entitle the police to break down his door. The emergency aid doctrine does not justify the warrantless intrusion into his home.

## II.  *Exigent Circumstances*

The Attorney General also argues that the police action in this case comes within the exigent circumstances exception to the warrant requirement. Because warrantless entry into a home is presumptively unreasonable, the government bears the burden of establishing exigent circumstances (*Troyer, supra,* 51 Cal.4th at p. 606), and we find none that justify forced entry here. Our Supreme Court has defined exigent circumstances as "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." (*People v. Ramey* (1976) 16 Cal.3d 263, 276.)

The Attorney General argues exigent circumstances based, in part, on the officers' reasonable belief that an injured person in the garage needed immediate aid. This is a reframing, under a different label, of the emergency aid argument. (See, e.g., *Tamborino*, *supra*, 41 Cal.3d at p. 925 [exigent circumstances excuse warrantless intrusion into an apartment where police reasonably believe robbery victims might be present].) The argument should be rejected here for the same reason.

But the Attorney General also argues exigent circumstances in that an armed shooter might be in the garage apartment even after defendant has left it. Sergeant Simmont could reasonably conclude "there was *a possibility* a firefight . . . had occurred," and that shooters "*may* be inside the residence," the Attorney General asserts. (Italics added.) Police may have harbored a "suspicion that activities intended to be hidden were continuing in the home," as the Attorney General alleges, but none of this

9

conjecture rises to the level of probable cause to believe that a shooting suspect was in the garage, and the Attorney General does not argue otherwise.

This shortfall is fatal, for "to fall within the exigent circumstances exception to the warrant requirement, an arrest or detention within a home or dwelling must be supported by *both* probable cause and the existence of exigent circumstances." (*People v. Lujano* (2014) 229 Cal.App.4th 175, 183; see also *People v. Thompson* (2006) 38 Cal.4th 811, 818 (*Thompson*) ["entry into a home based on exigent circumstances requires *probable cause* to believe that the entry is justified by . . . factors such as the imminent destruction of evidence or the need to prevent a suspect's escape"]; *People v. Bacigalupo* (1991) 1 Cal.4th 103, 122; [factors that determine "whether exigent circumstances support the decision to make" a warrantless arrest in a residence include "whether probable cause is clear" and "whether the suspect is likely to be found on the premises entered"].)

Here, the totality of the circumstances fails to establish that when the police entered defendant's apartment they had probable cause to believe a shooter would be found there. Although ample evidence established that a shooting had occurred outside the apartment, no witnesses or other evidence placed a gunman inside the residence at any time before the police broke down defendant's door. Indeed, no evidence placed anyone but defendant in the garage at any point that evening, so that once defendant had come into the kitchen, police had no reason to believe anybody—shooter or otherwise—remained in the garage. With Bazan and defendant in handcuffs, the very idea that a shooter remained at large was speculative. This case is therefore clearly distinguishable from *Stamper*, the primary case on which the Attorney General relies. In *Stamper*, police received a report of gunshots within the residence and then heard with their own ears the sound of a shotgun being chambered inside the residence. (*Stamper, supra*, 106 Cal.App.3d at p. 304.) By contrast here, no sounds at all came from the garage apartment after defendant came out and was detained in the kitchen.

In sum, lacking probable cause to believe a shooting suspect would be found in defendant's apartment, the police could not rely on exigent circumstances to justify breaking down his door and entering his home to look for a shooter.

10

     \*     \*     \*     \*     \*

The majority cites *Ryburn* for the proposition that "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." (Maj. opn., *ante*, at p. 10, citing *Ryburn*, *supra*, 565 U.S. at pp. 476–477].) But courts do police officers no favors when we abdicate our responsibility to exercise "independent judgment" on the lawfulness of a search. (*Duncan*, *supra*, 42 Cal.3d at p. 97.)

At stake are bedrock principles of constitutional law. First, " 'the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." ' " (*Thompson*, *supra*, 38 Cal.4th at p. 817.) Second, entry requires a warrant unless the evidence establishes " 'one of the few "specifically established and well-delineated exceptions" to the warrant requirement.' " (*Id*. at p. 818.) If today we stretch the emergency aid doctrine to allow intrusion into the home based on only an unparticularized suspicion that an injured person may be inside, or if we dispense with the requirement of probable cause when police are searching for a felon in exigent circumstances, then these exceptions become no longer " ' "few in number and carefully delineated." ' " (*People v. Ledesma* (1987) 43 Cal.3d 171, 233.) Justice Scalia would have the Fourth Amendment's " 'firm line at the entrance to the house,' . . . be not only firm but also bright." (*Kyllo, supra*, 533 U.S. at p. 40.)

Because I believe today's decision obscures that line, I respectfully DISSENT.

 

                               _____

                               TUCHER, J.

| Trial court: | San Mateo County Superior Court |
| --- | --- |
| Trial judge: | Honorable Steven L. Dylina and Donald J. Ayoob |
| Counsel for defendant and appellant: | Gordon S. Brownell, under appointment by the Court of Appeal |
| Counsel for plaintiff and respondent: | Xavier Becerra, Attorney General<br>Gerald A. Engler, Chief Assistant Attorney General<br>Jeffrey M. Laurence, Senior Assistant Attorney General<br>Catherine A. Rivlin, Supervising Deputy Attorney General<br>Bruce M. Slavin, Deputy Attorney General |

A152455