Filed 12/12/2019; on rehearing

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ADAN RUBIO,<br><br>        Defendant and Appellant. | A152455<br><br>(San Mateo County<br>Super. Ct. No. 16-SF-012681-A) |

If a man lives in a high crime neighborhood and somebody discharges a firearm outside his home, may the police break down his door and enter his apartment when he refuses to invite them in to investigate?  The Fourth Amendment answers a resounding "no"—at least not without circumstances, not present here, that would cause a reasonable person to believe that someone in the apartment stood in need of emergency aid, or that some other exception to the warrant requirement applied.  The need to render emergency aid justifies warrantless entry only where officers have " ' "specific and articulable facts" ' " showing that an intrusion into the home was necessary.  (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1043 (*Ovieda*).)  It is not enough that officers seek to rule out "the possibility that someone . . . might require aid."  (*Id.* at p. 1047.)

These principles render the warrantless search of defendant Adan Rubio's garage apartment unconstitutional.  Defendant here appeals his conviction by plea to possession of a controlled substance while armed with a firearm (Health & Saf. Code, § 11370.1), a plea entered after the trial court denied his motion to suppress the evidence found in his

1

apartment (Pen. Code, § 1538.5).[1]  Because we conclude the evidence was gathered in violation of defendant's Fourth Amendment rights, we reverse his conviction and remand to allow defendant to withdraw his plea.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 19, 2016, at approximately 10:40 p.m., East Palo Alto Police Department Sergeant Clint Simmont received an alert on his "ShotSpotter" application that shots had been fired near 2400 Gonzaga Street.  The ShotSpotter system detects and triangulates the location of gunfire via microphones deployed throughout the city.  Here ShotSpotter notified Sergeant Simmont of two separate bursts of gunfire.  First came five rounds from the edge of the garage driveway area of 2400 Gonzaga, then a minute later six rounds at "the edge of the driveway, near the sidewalk."  Sergeant Simmont testified that 2400 Gonzaga is located in a high-crime neighborhood, and that he had responded to more murders within a block of that location than anywhere else in East Palo Alto.

Sergeant Simmont and a team of four other officers arrived near 2400 Gonzaga Street and parked 60 to 70 feet from the edge of the driveway.  Two officers spoke with witnesses who had heard gunfire.  Pointing towards a boat in the driveway of 2400 Gonzaga, they reported they had seen flashes coming from the other side of the boat.  As the officers approached the house with their guns out, they found a spent shell casing on the ground at the top of the driveway, near the garage.  Sergeant Simmont believed the casing was a .45 caliber round and might have come from a semiautomatic weapon.

Approximately one minute after the officers found the spent shell casing, a man identified as Joshua Bazan walked through the wooden gate of a fence that separated the front and back yards of the house.  Sergeant Simmont recognized Bazan from prior contacts and testified that Bazan frequently drank and yelled at police.  Sergeant Simmont also knew that Bazan did not reside at 2400 Gonzaga.  As he came through the gate, Bazan began yelling obscenities at the officers and assumed a combative position.  The officers arrested Bazan and placed him in a patrol car.

---

[1] Unless otherwise specified, all further statutory references are to the Penal Code.

After Bazan's arrest, officers located two additional spent casings behind the open gate that Bazan had passed through. Sergeant Simmont concluded gunfire had come from near the gate, although he could not testify from which side. Sergeant Simmont testified that he was "investigating whether or not we had a victim or a shooter [who] was hiding out."

Sergeant Simmont pounded loudly on a door attached to the side of the garage and announced police presence four or five times. No one responded, but Sergeant Simmont heard what sounded like someone inside the garage pushing items against the door, and he noticed that the door appeared to be flexing. Sergeant Simmont believed someone was attempting to barricade the door. As Sergeant Simmont was knocking on the door, a man came to a window next to the garage and, when Sergeant Simmont ordered him to open the door, indicated that the door led not to the garage, but instead to a separate room.

Sergeant Simmont and his colleagues spoke with several people at the front door to the residence. When asked whether anyone in the house had been shot, defendant's father, Francisco Rubio Sr., responded "I don't think so." He had been asleep until awoken by the sound of gunfire and, getting out of bed to investigate, had seen nobody. Sergeant Simmont testified that he asked Francisco Sr. for permission to search the house, which Francisco Sr. granted, but Francisco Sr. testified that the officers never asked him for permission to enter the house.

Once inside the house, officers asked Francisco Sr. who was inside the garage, and he responded that his son was. Sergeant Simmont then asked for permission to search the garage, and Francisco Sr. responded, "Sure." Attempting to open the door from the house to the garage, Francisco Sr. found that it was locked, but told the officers he would get the key.

As Francisco Sr. was getting the key, defendant emerged from the garage, opening the door "just enough to slide his body out." Defendant closed the door, which automatically locked behind him, and approached the officers with his hands in his pockets, yelling for them to shoot him. Sergeant Simmont repeatedly ordered defendant

3

to show his hands. Defendant eventually took his hands out of his pockets and, as he did so, threw a key ring into the kitchen sink. Officers detained defendant and placed him in a patrol car.

The officers retrieved the key defendant had thrown into the sink and attempted to use it to open the door to the garage. When defendant's key did not work, Sergeant Simmont and another officer kicked the door open and entered the garage. Sergeant Simmont testified that he was uncertain what was on the other side of the door and that he had no reason to believe anyone had been shot, but he "didn't have anything to rule that out, either."

Upon entering the garage, Sergeant Simmont observed that the garage was a converted apartment. The officers did not find anyone inside the apartment, but did observe "an explosive device on a shelf." The officers also found and collected an operable .45 semiautomatic Smith & Wesson pistol on the shelf in an open closet. Sergeant Simmont noticed that the door he had knocked on earlier from the outside was barricaded by furniture.

The officers cleared the house of all occupants to secure the scene. At around 5:18 a.m., a search warrant was obtained. The officers reentered the residence and executed the warrant. The officers found an operable .357 Smith & Wesson handgun, twenty .40-caliber bullets, 87 live .357-caliber bullets, a body armor vest, six spent .357 Smith & Wesson shell casings, and a plastic twist-off bindle in a shot glass with a clear, rock-like substance, later identified as methamphetamine. Sergeant Simmont located surveillance equipment with a view of the driveway and a video that showed three people walking down the driveway. Defendant is seen pulling out a revolver and firing six shots into the air. Defendant and two other individuals, Bazan and possibly defendant's brother, are then seen running back through the gate next to the house.

Following the filing of a five-count felony complaint, defendant filed a motion to suppress evidence. At a hearing on the motion to suppress, the prosecution argued that the warrantless entry into defendant's garage was justified under multiple theories: community caretaking, emergency aid, exigent circumstances, and consent. The

magistrate noted that it was "a very close case" but, citing *People v. Ray* (1999) 21 Cal.4th 464 (*Ray*), disapproved in part in *Ovieda*, *supra*, 7 Cal.5th at p. 1038, denied the motion on the theory that the search satisfied the community caretaking exception.

The San Mateo County District Attorney then filed a six-count felony information, charging defendant with discharge of a firearm with gross negligence (§ 246.3, subd. (a) (count one)), possession of a controlled substance while armed with a firearm (Health & Saf. Code, § 11370.1, subd. (a) (count two)), unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1) (counts three and four)), unlawful possession of ammunition (§ 30305, subd. (a)(1) (count five)), and possession of an explosive (Health & Saf. Code, § 12305 (count six)), with a special allegation that defendant is ineligible for probation because of two prior offenses (§ 1203, subd. (e)(4)).

Defendant filed a motion to set aside the information pursuant to section 995, alleging that the evidence presented at the preliminary hearing should have been suppressed pursuant to section 1538.5. Defendant also renewed the original motion to suppress evidence. Citing the emergency aid doctrine of the community caretaking exception, the trial court denied defendant's motion to set aside the information and denied the motion to suppress.

Following this second denial of his motion to suppress, defendant entered a plea of no contest to violating Health and Safety Code section 11370.1, as charged in count two, and admitted the special allegation pursuant to section 1203, subdivision (e)(4). The trial court sentenced him to three years of supervised probation, subject to conditions including nine months in the county jail or a residential substance abuse treatment program. Defendant filed a timely notice of appeal.

In our first review of defendant's case earlier this year, we affirmed his conviction, relying on the community caretaking exception articulated in *Ray* and other cases to uphold the search. Less than four weeks after we announced our decision, the California Supreme Court decided *Ovieda*, in which it disapproved the lead opinion in *Ray* to the extent the prior decision had relied on an expansive reading of the community caretaking exception to allow warrantless entry into a home. (*Ovieda*, *supra*, 7 Cal.5th at p. 1038.)

5

We then, on our own motion, granted rehearing and asked the parties to brief the significance of *Ovieda* for this case.

## DISCUSSION

The Fourth Amendment draws a " 'firm line at the entrance of the house.' " (*People v. Bennett* (1998) 17 Cal.4th 373, 386, citing *Payton v. New York* (1980) 445 U.S. 573, 590.) At the amendment's "very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (*Silverman v. United States* (1961) 365 U.S. 505, 511 (*Silverman*).) Thus, "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." (*Kyllo v. United States* (2001) 533 U.S. 27, 31 (*Kyllo*).)

The Attorney General urges two exceptions to the Fourth Amendment's warrant requirement as justifying the warrantless intrusion in this case, but he is wrong on both counts. The emergency aid exception does not apply because the police had no reasonable basis to conclude there was anybody inside the apartment who was in danger or distress. And the exigent circumstances exception fails otherwise to justify the forced entry because police had no reason to believe a shooter was hiding out in the apartment or that evidence of criminal conduct would be destroyed before the police had a chance to obtain a warrant.

"On appeal, a reviewing court must affirm the trial court's determinations of the factual questions if they are supported by substantial evidence, but must take the ultimate responsibility for deciding the legal question according to its independent judgment." (*People v. Duncan* (1986) 42 Cal.3d 91, 97 (*Duncan*).) Here, we review the propriety of the magistrate's decision, not the decision of the superior court that affirmed it. (*People v. Thompson* (1990) 221 Cal.App.3d 923, 940; *People v. Stamper* (1980) 106 Cal.App.3d 301, 304 (*Stamper*).)

## I.    *Emergency Aid Doctrine*

The emergency aid exception to the warrant requirement allows police to "enter a home without a warrant when they have an objectively reasonable basis for believing that

6

an occupant is seriously injured or imminently threatened with such injury." (*Brigham City v. Stuart* (2006) 547 U.S. 398, 400 (*Brigham City*); accord *People v. Troyer* (2011) 51 Cal.4th 599, 606 (*Troyer*).) In determining whether an officer acted reasonably, " 'due weight must be given not to his unparticularized suspicions or " 'hunches,' " but to the reasonable inferences which he is entitled to draw from the facts in light of his experience; in other words, he must be able to point to specific and articulable facts from which he concluded that his action was necessary.' " (*Duncan, supra,* 42 Cal.3d at pp. 97–98; accord *Terry v. Ohio* (1968) 392 U.S. 1, 23.)

Missing in this case are specific and articulable facts that would lead a reasonable person to conclude shots fired *outside* defendant's garage apartment required breaking down the door to rescue someone *inside* his home. Shotspotter data and percipient witness observations placed all of the gunfire outside the home, in or near the driveway and the gate to the backyard. There were no bullet holes in windows or siding to suggest that any of the shots fired outside the home had penetrated into the garage. There were no drops of blood on the ground to suggest anybody in range of the gunshots had been hit. Police talked to eyewitnesses but heard no reports of a scuffle, nor of any other sounds or sights suggesting anyone had been threatened or injured. When police asked Francisco Sr. if anyone had been shot, he said he didn't think so, and when they asked him who was in the garage apartment, he mentioned only his son, who subsequently came out in response to police demands.

Other than the simple fact that shots were fired outside defendant's home, the Attorney General musters only the ample evidence that two people in this high-crime neighborhood were antagonistic toward the police. First, the response to Sergeant Simmont's pounding on the outside door of defendant's apartment and announcing police presence was an evident attempt to barricade the door from the inside. Then, a man who did not live at the house and who had a habit of "making his dissatisfaction [with] the police known" emerged from the backyard in a belligerent manner. Finally, defendant responded to the continued police attempts to gain access to his apartment by coming out

into the kitchen with his hands in his pockets, daring the police in a loud voice to shoot him.

These facts may justify the police in detaining defendant and Bazan in handcuffs while they continue their investigation, but they do not support an inference that an injured person remained in the garage. Bazan had no reported link to the home, so his presence outside it says nothing about what is happening inside. Was Bazan a friend or foe of the inhabitants? Was he responsible for the shots fired? At this point, the police did not know. They did know, or at least had strong reason to believe, that the only reported occupant of the garage wanted no contact with them, and that he feared police would break down his door. But defendant's evident distrust of police and preference for avoiding any interaction with them does not plausibly support an inference that somebody else was in his apartment suffering from a gunshot wound. Even after police detained Bazan and defendant, they learned nothing to substantiate their original suspicion that an injured person might be in the garage.

With nothing more than an "unparticularized suspicion[]" that emergency aid might be necessary, the police may not breach the firm line the Fourth Amendment draws at the entrance to defendant's home. (*Duncan*, *supra*, 42 Cal.3d at pp. 97–98.) They cannot break down defendant's door simply because Sergeant Simmont "didn't have anything to rule . . . out" the possibility that someone inside had been shot. As *Ovieda* explains, the line demarking constitutional conduct "falls between the mere inchoate possibility that an emergency *could* exist and the officer's articulation of facts that make it reasonable, even if uncertain, to believe an emergency *does* exist." (*Ovieda, supra*, 7 Cal.5th at p. 1049.) Sergeant Simmont admitted he had no reason to believe an injured person was in the apartment, placing this case firmly on the "inchoate possibility" side of the Fourth Amendment line. As in *Ovieda*, "[t]he officers here may well have acted with the very best of intentions. But just as an officer's venial motives will generally not undermine an otherwise valid search, a benign intent cannot save an invalid one." (*Id.* at p. 1052.)

In *Ovieda*, officers responded to the defendant's home "after family members reported he was suicidal and had access to a gun." (*Ovieda*, *supra*, 7 Cal.5th at p. 1038.) Officers "learned defendant was inside with two friends," who "were able to disarm him" and lead him out. (*Id*. at pp. 1038–1039.) But after Ovieda and his friends emerged from the home, officers still " 'felt duty bound to secure the premises and make sure there were no people inside that were injured or in need of assistance.' " (*Id*. at p. 1039.) Officers had "no 'specific information that led [them] to believe somebody else was inside.' " (*Id*. at p. 1040.) They had "no reports that shots had been fired, that defendant had threatened anyone else, or that there were any victims inside the house," causing our Supreme Court to conclude the officers lacked " ' "specific and articulable facts" ' " supporting an inference that their intrusion was necessary. (*Id*. at p. 1043.) Warrantless entry into Ovieda's home was accordingly not justified by any need to render emergency aid. (*Id*. at p. 1043.) And to the extent the lead opinion in *Ray* authorized warrantless entry into a private home for community caretaking in circumstances short of an emergency, *Ovieda* disapproved it. (*Ovieda,* at pp. 1038, 1048.)

The Attorney General relies on *Ray*, but a majority of justices in that case concluded the need to render emergency aid did not justify warrantless entry into an empty apartment. The lead opinion concludes, although "[t]he officers were concerned for the possibility of an injured person inside the residence," they "had no knowledge of any facts that would lead a reasonable person in their position to believe entry was immediately necessary to aid life or limb." (*Ray, supra,* 21 Cal.4th 464 at p. 473 (lead opn.).) Joining them on this point was Justice Mosk, whose dissent found no justification for the warrantless search at all. (*Id*. at p. 482 (dis. opn. of Mosk, J.).) Thus, to the extent our case is analogous, *Ray* precludes us from justifying this search under the emergency aid doctrine.

Other California cases applying the emergency aid exception to the warrant requirement are no more helpful to the Attorney General. In *Stamper, supra,* 106 Cal.App.3d 301, police responded to a report that two gunshots had been fired *within* a residence. When they approached and knocked on the door, an officer " 'heard from

9

within the residence what sounded to be like a shotgun being chambered.' " (*Id.* at p. 304.) Not surprisingly, the court upheld warrantless entry in that case. (*Id.* at p. 306.) Unlike in our case, where the police broke into defendant's apartment without any evidence of a firearm, gunshots, or an injured person within, in *Stamper* the police had evidence that shots had just been fired inside the home, and that somebody inside was again preparing to use a firearm even as the police stood by outside.

Similarly, in *Tamborino v. Superior Court* (1986) 41 Cal.3d 919, the police responded to a report of a robbery at an address where a victim "was believed to be injured and bleeding." (*Id.* at pp. 921–922.) Officers responding to the scene observed blood outside the defendant's apartment building and outside his apartment door. Also, a witness "confirmed that an injured person was inside the apartment." (*Id.* at p. 922.) Unsurprisingly, the court held that these facts gave officers sufficient reason to enter in search of injured persons. But our case, with no sign of blood and no witnesses reporting injury, is clearly distinguishable. (See also *Troyer*, *supra*, 51 Cal.4th at p. 610 [emergency aid justifies intrusion where "police arrived minutes after a reported shooting to find one victim with gunshot wounds, another bleeding heavily from a head wound, blood on the door indicating an injured victim had entered or exited the residence, a report of a male shooting victim who may still have been unaccounted for, and evasive or unreliable responses from [one victim] as to whether anyone inside needed assistance"].)

The Attorney General also relies on two federal cases that are distinguishable in that both involve police who see evidence that a person in the home has been injured *and* that violence is ongoing in the home. In *Brigham City, supra*, 547 U.S. 398, the officers see and hear a fight taking place inside a house, and then watch through a window as one victim takes a punch to the face, spitting blood. (*Id.* at p. 406.) In *Michigan v. Fisher* (2009) 558 U.S. 45, officers investigating a report of a man " 'going crazy' " find, in the driveway, blood in and on a pickup truck whose front has been smashed, and more blood on the door to the house. (*Id.* at p. 45.) Through a window they see a man "inside the house, screaming and throwing things," perhaps at "a spouse or a child." (*Id.* at pp. 46, 48.) That the emergency aid exception justified warrantless entry in these two cases

10

means nothing for our case, where the police forced entry into defendant's home without any evidence that there was an injured person in the apartment, and without evidence that violence was occurring, or had occurred, inside the home.

More analogous is a case from a sister state whose supreme court refused to apply the emergency aid doctrine even where there was evidence linking gunfire to a room the police entered. In *People v. Davis* (1993) 442 Mich. 1 [497 N.W.2d 910], police dispatch alerted officers that a motel desk clerk had called in "Room 33 or 34 . . . shots fired." (*Id.* at p. 911.) Officers reporting to the scene noticed nothing unusual and chose not to speak with the desk clerk or motel manager, "but instead went directly to the rooms," knocking and announcing police presence at the first door they reached. (*Ibid.*) Although the defendant peeked out the window, she did not open the door to her hotel room for three to five minutes. When she did, the police entered the room without a warrant, found contraband, and arrested her. (*Id.* at pp. 911–912.) The Michigan Supreme Court, after carefully analyzing the legal issues, noted the police had no corroboration for the sketchy information they had received from dispatch, and no suggestion "that any person was injured, other than by implication because of the inherently dangerous nature of gunshots." (*Id.* at p. 921.) On these facts, the court rejected application of the emergency aid doctrine, concluding that "the constitution prohibits [police] from forcing entry into a dwelling on the basis of a speculation that someone inside may have been injured." (*Id.* at p. 922.) (See also *United States v. Timmann* (11th Cir. 2013) 741 F.3d 1170 [emergency aid doctrine does not justify police entry into an apartment from which a bullet had earlier pierced neighboring apartment's wall].) The emergency aid doctrine is even less appropriate in defendant's case, where there was never evidence of gunfire within (or emitting from) his home.

Although the police had no evidence linking anyone inside defendant's apartment to the reports of shooting outside it, they did have evidence that someone in the garage sought to deny them entry. But defendant, as much as any American, has "the right . . . to retreat into his own home and there be free from unreasonable governmental intrusion." (*Silverman, supra,* 365 U.S. at p. 511.) He should not need a barricade to

11

fortify that right. We do not condone the hostility that defendant (and Bazan) exhibited toward the police. But nor can we ignore that " 'as a practical matter neither society nor our enforcement of the laws is yet color-blind,' " and the resulting "uneven policing may reasonably affect the reaction of certain individuals—including those who are innocent— to law enforcement." (*United States v. Brown* (9th Cir. 2019) 925 F.3d 1150, 1156.) That defendant lived in a high crime neighborhood, that a shooting had just occurred outside his home, and that he chose initially to exercise his constitutional right to be left alone in his own apartment do not entitle the police to break down his door. The circumstances of this case do not establish reason to believe that after defendant was detained in handcuffs there was anyone in his apartment in need of emergency aid.

## II.     *Exigent Circumstances*

Separate and apart from the emergency aid exception to the warrant requirement, the Attorney General argues that the police action in this case comes within the exigent circumstances exception to the warrant requirement. Because warrantless entry into a home is presumptively unreasonable, the government bears the burden of establishing exigent circumstances (*Troyer, supra,* 51 Cal.4th at p. 606), and we find none that justify forced entry here. Our Supreme Court has defined exigent circumstances as "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." (*People v. Ramey* (1976) 16 Cal.3d 263, 276.)

The Attorney General argues exigent circumstances based, in part, on the officers' concern that an injured person in the garage needed immediate aid. This is a reframing of the emergency aid argument we have already rejected. (See, e.g., *Ovieda*, *supra*, 7 Cal.5th at pp. 1041–1042 [exigent circumstances includes "when an entry or search appears reasonably necessary to render emergency aid, whether or not a crime might be involved"].)

The Attorney General also cites case law addressing the constitutionality of a "warrantless search" but does not argue that there was an exigent need to search Rubio's apartment for evidence. Nor would such an argument have succeeded here, where there

was no indication that someone in the apartment was about to destroy evidence of the shooting.

What the Attorney General does argue is that exigency existed in that a shooter might be in the garage apartment even after defendant had left it. Sergeant Simmont could reasonably conclude "there was *a possibility* a firefight . . . had occurred," and that shooters "*may* be inside the residence," the Attorney General asserts. (Italics added.) Although police may have harbored a "suspicion that activities intended to be hidden were continuing in the home," as the Attorney General alleges, none of this conjecture rises to the level of probable cause to believe that a shooting suspect was in the garage, and the Attorney General does not argue otherwise.

This shortfall is fatal, for "to fall within the exigent circumstances exception to the warrant requirement, an arrest or detention within a home or dwelling must be supported by *both* probable cause and the existence of exigent circumstances." (*People v. Lujano* (2014) 229 Cal.App.4th 175, 183; see also *People v. Thompson* (2006) 38 Cal.4th 811, 818 ["entry into a home based on exigent circumstances requires *probable cause* to believe that the entry is justified by . . . factors such as the imminent destruction of evidence or the need to prevent a suspect's escape"]; *People v. Bacigalupo* (1991) 1 Cal.4th 103, 122 [factors that determine "whether exigent circumstances support the decision to make" a warrantless arrest in a residence include "whether probable cause is clear" and "whether the suspect is likely to be found on the premises entered"].)

Here, the totality of the circumstances fails to establish that when the police entered defendant's apartment they had probable cause to believe a shooter would be found there. Although ample evidence established that a shooting had occurred outside the apartment, no witnesses or other evidence placed a gunman inside the residence at any time before the police broke down defendant's door. Indeed, no evidence placed anyone but defendant in the garage at any point that evening, so that once defendant had come into the kitchen, police had no reason to believe anybody—shooter or otherwise— remained in the garage. With Bazan and defendant in handcuffs, the very idea that a shooter remained at large was speculative. This case is therefore clearly distinguishable

13

from *Stamper*, the primary case on which the Attorney General relies. In *Stamper*, police received a report of gunshots within the residence and then heard with their own ears the sound of a shotgun being chambered inside the residence. (*Stamper, supra*, 106 Cal.App.3d at p. 304.) By contrast here, no sounds at all came from the garage apartment after defendant came out and was detained in the kitchen.[2]

In sum, lacking probable cause to believe a shooting suspect would be found in defendant's apartment, the police could not rely on exigent circumstances to justify breaking down his door and entering his home to look for a shooter.

## DISPOSITION

The judgment is reversed, and the case is remanded for further proceedings.

---

[2] Also distinguishable is *Ryburn v. Huff* (2012) 565 U.S. 469 (*Ryburn*), on which the dissent relies. In *Ryburn*, the Court was not deciding whether an unwarranted intrusion into the home violated the Fourth Amendment, but whether police officers were entitled to qualified immunity from suit (*id*. at pp. 472, 477), an issue the Supreme Court has repeatedly emphasized as different. (See, e.g., *Saucier v. Katz* (2001) 533 U.S. 194, 203, overruled on another point in *Pearson v. Callahan* (2009) 555 U.S. 223, 236; *Safford Unified School Dist. #1 v. Redding* (2009) 557 U.S. 364, 378–379; *Camreta v. Greene* (2011) 563 U.S. 692, 705–707.) *Ryburn* is also factually distinguishable, in that there the police entered through an open door, behind a woman whose son had credibly threatened to " 'shoot up' " his school, and after the woman ran into the house upon being asked whether there were guns inside. (*Ryburn,* at pp. 470–471.) Police explained the intrusion as necessary to protect officer safety (*id*. at pp. 473–474), a justification not offered for the intrusion in this case.

_____
TUCHER, J.

I CONCUR:


_____
BROWN, J.

**POLLAK, P. J., Dissenting.**

In the initial opinion from this court, the majority upheld the entry into the garage in question under what the lead opinion in *People v. Ray* (1999) 21 Cal.4th 464 considered a "community caretaking" exception to the Fourth Amendment warrant requirement for the uninvited entry into one's home. Shortly after the issuance of our opinion, the California Supreme Court disapproved of that rationale in *People v. Ovieda* (2019) 7 Cal.5th 1034. The court did, however, reaffirm the so-called "exigent circumstances" exception which the concurring three justices in *Ray* had considered to justify the entry in that case. Quoting an earlier opinion, the court in *Ovieda* repeated, " ' " 'There is no ready litmus test for determining whether [exigent] circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.' " ' " (*Id.* at p. 1041.) The court went on to state, "The need to render emergency aid is a well-recognized part of the exigent circumstances exception. But it has always required that *articulable facts support a reasonable belief* that an emergency exists." (*Id.* at p. 1048, italics added.) The court pointed out that the *Ray* lead opinion found that no such facts were established, approving a warrantless entry if "the need was merely hypothetical." (*Ibid.*) The court disapproved of the entry in *Ovieda* because "the officers [there] could not articulate facts pointing to an emergency." (*Id.* at p. 1049; see also *id.* at p. 1043.)

While *Ovieda* requires a more demanding scrutiny of the circumstances than the lead opinion in *Ray,* the record here does reflect articulable facts establishing the officers' reasonable belief in the existence of an emergency. As the prosecutor and the Attorney General have summarized the situation: "1) there were shots fired from multiple locations in the driveway; 2) a verbally aggressive person exited the gate of the residence and took a fighting stance; 3) Sergeant Simmont recognized that the person did not live at the residence; 4) shell casings were observed outside the residence; 5) the shell casings appeared to lead to a door going into the garage; 6) when he knocked and announced his presence, Sergeant Simmont heard movement inside that sounded like someone barricading the door; 7) the sounds led officers to believe someone may have been held

1

captive on the other side of the door; 8) [defendant] was acting erratically and refused to show his hands; and 9) the neighborhood was known as a high crime area."

As the trial court put these facts together, "what the defense is asking is for this court to second guess the actions of an officer in the field who knows that shots have been fired, sees physical evidence of the location where the firearm was discharged, hears movement within the home that he seeks entry to that is consistent with a reasonable fear that a victim of a shooting may be being secreted within the residence based on his prior experience, further that that activity to barricade the door was upon his request to enter as opposed to a verbal response saying, no, you can't come in. There's physical activity suggesting an attempt to barricade the door. And then the appearance of Mr. Bazan . . . and his oppositional behavior in a manner where he had no right of possession over the premises . . . heightened the exigent moment with regard to the decision making an officer must make in the field where firearms are being or have very recently been discharged."

Deeming unreasonable Sergeant Simmont's on-the-spot belief that immediate entry was necessary to protect human life disregards the circumspection mandated by the United States Supreme Court when it criticized a circuit court for "not heed[ing] the District Court's wise admonition that judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation. With the benefit of hindsight and calm deliberation, the panel majority concluded that it was unreasonable for petitioners to fear that violence was imminent. But we have instructed that reasonableness 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and that '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving.' " (*Ryburn v. Huff* (2012) 565 U.S. 469, 477 (*per curiam*).) As in that case, I believe that here, "[j]udged from the proper perspective of a reasonable officer forced to make a split-second decision in response to a rapidly unfolding chain of events . . . [the officers'] belief that entry was necessary to avoid

2

injury to themselves and others was eminently reasonable." (*Id.* at p. 477; see also, e.g., *Brigham City v. Stuart* (2006) 547 U.S. 398, 406; *Michigan v. Fisher* (2009) 558 U.S. 45, 49 (*per curiam*).)

I therefore conclude that the officers forced entry in this case was justified by the exigent circumstances exception to the warrant requirement (as well as by the now-discredited community caretaking exception on which we previously relied), and that defendant's conviction should be affirmed. Indeed, I believe, as the Court of Appeal did in *People v. Stamper* (1980) 106 Cal.App.3d 301, 306, that "a failure of the police to investigate as they did, 'would have constituted a failure to properly discharge [their] duties as [officers] of the law.' "

_____

POLLAK, P. J.

3

| | |
|---|---|
| Trial court: | San Mateo County Superior Court |
| Trial judge: | Honorable Steven L. Dylina and Donald J. Ayoob |
| Counsel for defendant and appellant: | Gordon S. Brownell, under appointment by the Court of Appeal |
| Counsel for plaintiff and respondent: | Xavier Becerra, Attorney General<br>Gerald A. Engler, Chief Assistant Attorney General<br>Jeffrey M. Laurence, Senior Assistant Attorney General<br>Catherine A. Rivlin, Supervising Deputy Attorney General<br>Bruce M. Slavin, Deputy Attorney General |

*People v. Rubio* (A152455)